# EXHIBIT 5

# William Weidner 3/3/20 Deposition Excerpts

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| SNOW COVERED CAPITAL, LLC, | Case No. 2:19-00595-JAD-NJK |
| Plaintiff, | |
| vs. | |
| WILLIAM WEIDNER, ANDREW FONFA, DAVID JACOBY, and LUCKY DRAGON LP, | |
| Defendants. | |
| SHELLEY D. KROHN, Chapter 7 Trustee of The LUCKY DRAGON, LP Estate, | |
| Counter-claimant, | |
| vs. | |
| SNOW COVERED CAPITAL, LLC, NELLIE LLC, 1421 CAPITAL, LLC, and ASSOCIATE CAPITAL, LLC, | |
| Counter-defendants. | |

DEPOSITION OF WILLIAM P. WEIDNER

Las Vegas, Nevada

Tuesday, March 3, 2020

Reported By:
Janet C. Trimmer, CRR, RPR
NV CCR No. 864

Job No. 24238

## Page 2

```
 1           UNITED STATES DISTRICT COURT
 2               DISTRICT OF NEVADA
 3      _____
 4                    ) Case No.
        SNOW COVERED CAPITAL, LLC,  ) 2:19-00595-JAD-NJK
 5                    )
           Plaintiff,       )
 6      vs.               )
                          )
 7      WILLIAM WEIDNER, ANDREW    )
        FONFA, DAVID JACOBY, and   )
 8      LUCKY DRAGON LP,          )
                          )
 9         Defendants.       )
                          )
10      _____)
        SHELLEY D. KROHN, Chapter 7  )
11      Trustee of The LUCKY DRAGON, )
        LP Estate,           )
12                     )
           Counter-claimant,      )
13      vs.                )
                          )
14      SNOW COVERED CAPITAL, LLC,  )
        NELLIE LLC, 1421 CAPITAL,   )
15      LLC, and ASSOCIATE CAPITAL,  )
        LLC,                )
16                     )
           Counter-defendants.   )
17      _____)
18
19          Deposition of WILLIAM P. WEIDNER, taken on
20     behalf of Plaintiff, at Santoro Whitmire, Ltd., 10100
21     West Charleston Boulevard, Suite 250, Las Vegas,
22     Nevada, beginning at 9:11 a.m. and ending at 5:21 p.m.
23     on Tuesday, March 3, 2020, before Janet C. Trimmer,
24     Nevada Certified Court Reporter No. 864, RPR, CRR.
25
```

## Page 3

```
 1    APPEARANCES:
 2
      FOR SNOW COVERED CAPITAL:
 3
           DIAMOND McCARTHY, LLP
 4         BY: JASON P. FULTON, ESQ.
               JAMES D. McCARTHY, ESQ.
 5         2711 North Haskell Avenue
           Suite 3100
 6         Dallas, Texas 75204
           (214) 389-5300
 7         jfulton@diamondmccarthy.com
           jmccarthy@diamondmccarthy.com
 8
 9
      For DEFENDANTS WILLIAM WEIDNER & DAVID JACOBY:
10
           SANTORO WHITMIRE, LTD.
11         BY: NICHOLAS J. SANTORO, ESQ.
           10100 West Charleston Boulevard
12         Suite 250
           Las Vegas, Nevada 89135
13         (702) 948-8771
           nsantoro@santoronevada.com
14
15
      FOR DEFENDANT ANDREW S. FONFA:
16
           HOWARD & HOWARD ATTORNEYS PLLC
17         BY: MARK GARDBERG, ESQ.
           3800 Howard Hughes Parkway
18         Suite 1000
           Las Vegas, Nevada 89169
19         (702) 257-1483
           mg@h2law.com
20
21
22
23
24
25
```

## Page 4

```
 1               INDEX OF EXAMINATION
 2    WITNESS                              PAGE
 3
      WILLIAM P. WEIDNER    BY MR. FULTON    8
 4         Afternoon Session      134
 5                INDEX OF EXHIBITS
 6    NUMBER     PAGE  DESCRIPTION
 7    Exhibit 112   16 "Ownership Structure," SCC016248
 8    Exhibit 113   41 Document titled "Lucky Dragon
                      Hotel & Casino, Las Vegas,
 9                    Nevada Investment Opportunity,"
10                    SCC001984 to SCC002001
11    Exhibit 114   44 "Promissory Note," SCC016267 to
                      SCC01673
12
      Exhibit 115   76 "Hotel and Casino License
13                    Agreement," SCC016114 to
                      SCC016131
14
      Exhibit 116   81 Letter dated 8-18-17 from
15                    Enrique Landa, SCC039109 to
                      SCC039110
16
      Exhibit 117   86 E-mail dated 8-7-17, subject:
17                    FW: Status of Loan, DEFS022034
18    Exhibit 118  128 E-mail string, top e-mail dated
                      8-3-17, and attached term sheet,
19                    DEFS022625 to DEFS022632
20    Exhibit 119  142 E-mail dated 8-14-17, Subject:
                      Fortress Lucky Dragon LOI and
21                    Letter Agreement, and
                      attachment, DEFS003923 to
22                    DEFS003941
23    Exhibit 120  174 E-mail dated 12-27-17, Subject:
                      LD Marketing update, DEFS005761
24                    to DEFS005767
25    //
```

## Page 5

```
 1    EXHIBITS (CONTINUED):
 2    NUMBER     PAGE  DESCRIPTION
 3    Exhibit 121  178 E-mail dated 10-17-17, Subject:
                      Revised updated LD deal memo,
 4                    DEFS004470 to DEFS004472
 5    Exhibit 122  201 E-mail string, top e-mail dated
                      2-7-18, Subject: Fwd: Revised
 6                    offer, DEFS025727 to DEFS0025760
 7    Exhibit 123  202 E-mail dated 2-10-18, Subject:
                      Status summary, DEFS006511 to
 8                    DEFS006524
 9    Exhibit 124  240 "Defendant William Weidner's
                      Answers to Plaintiff Snow
10                    Covered Capital, LLC's First Set
                      of Interrogatories"
11
12
            PREVIOUSLY MARKED EXHIBITS (FONFA & JACOBY)
13
      NUMBER     PAGE  DESCRIPTION
14
      Exhibit 46    49 "Construction Loan Agreement,"
15                    DEF000042 to DEF000152
16    Exhibit 47    50 "Secured Promissory Note (Line
                      of Credit)," DEFS000219 to
17                    DEF000224
18    Exhibit 49    52 "Construction Deed of Trust
                      (With Assignment of Leases and
19                    Rents, Security Agreement and
                      Fixture Filing)," DEFS000231 to
20                    DEFS000267
21    Exhibit 50    52 "Recourse Obligations Guaranty,"
                      DEFS000176 to DEFS000190
22
      Exhibit 51    75 "Authorization Certificate and
23                    Consent of Sole Managers and
                      Members of Las Vegas Economic
24                    Impact Regional Center, LLC,"
                      DEFS000209 to DEFS000217
25    //
```

Page 6

PREVIOUSLY MARKED EXHIBITS (CONTINUED):
NUMBER      PAGE  DESCRIPTION
Exhibit 53   145  "Defendant Andrew Fonfa's Responses to Plaintiff Snow Covered Capital, LLC's Second Set of Interrogatories"
Exhibit 54   79   E-mail dated 8-15-17, Subject: FW: Snow Covered Capital, LLC - Construction Loan, DEFS023163 to DEFS023166
Exhibit 64   148  E-mail dated 11-15-17, "Subject: Lucky Dragon: Sahara Investment Note Payoff Demand," and attachment, DEFS004868 to DEFS004869
Exhibit 65   150  E-mail string, top e-mail dated 11-22-17, "Subject: Re: Snow covered," DEFS003661
Exhibit 66   157  E-mail dated 12-27-17, "Subject: Lucky Dragon Update," DEFS005754 to DEFS005760
Exhibit 67   197  E-mail dated 1-3-18, "Subject: Re: LD," DEFS025467
Exhibit 68   199  E-mail dated 1-3-18, "Subject: Re: LD," DEFS023199
Exhibit 70   192  E-mail dated 1-5-18, "Subject: Enrique," DEFS005877
Exhibit 81   248  Letter dated 3-2-18 from Bob Olson, and attachment, DEFS026277 to DEFS026281
Exhibit 93   122  E-mail dated 3-24-17, "Subject: List of Active Investors," DEFS0026321
Exhibit 94   124  E-mail dated 4-26-17, "Subject: Investor Update," & attachment, DEFS026322 to DEFS026323

Page 7

PREVIOUSLY MARKED EXHIBITS (CONTINUED):
NUMBER       PAGE  DESCRIPTION
Exhibit 96    125  E-mail dated 8-1-17, "Subject: Updated marketing status (note new names added)," DEFS003898
Exhibit 97    126  E-mail string, top e-mail dated 8-2-17, "Subject: Lucky Dragon Indicative Proposal v3 ACR.docx," DEFS003734 to DEFS003736
Exhibit 99    134  E-mail string, top e-mail dated 8-9-17, "Subject: Fwd: Term sheet revision version 8-8-2017 by Buyer," DEFS003834 to DEFS003835
Exhibit 105   180  E-mail dated 12-27-17, "Subject: Forbearance," and attachment, DEFS005819 to DEFS005826
Exhibit 106   190  E-mail dated 1-3-18, "Subject: Re: Timing," DEFS005840 to DEFS005842
Exhibit 110   228  "Defendants William Weidner's and David Jacoby's Amended Answer to the Complaint"

Page 8

Las Vegas, Nevada; Tuesday, March 3, 2020
9:11 A.M.
-oOo-

Whereupon --
(In an off-the-record discussion held prior to the commencement of the proceedings, counsel agreed to waive the court reporter's requirements under Rule 30(b)(5)(A) of the Federal Rules of Civil Procedure.)

WILLIAM P. WEIDNER, having been first duly sworn to testify to the truth, was examined and testified as follows:

EXAMINATION

BY MR. FULTON:
Q. Good morning.
A. Good morning.
Q. Would you state your name for the record?
A. William Peter Weidner, W-e-i-d-n-e-r.
Q. Mr. Weidner, where do you live?
A. I live a few blocks from here. 9711 Orient Express Court, Las Vegas, Nevada 89145.
Q. Have you been deposed before?

Page 9

A. Yes.
Q. How many times?
A. Twenty or so.
Q. I take it then you are well familiar with the rules for conducting an orderly deposition. I can skip those for this time.
A. Orderly deposition, I don't know how you define that.
Q. Well, the easiest one is --
A. Sometimes they are disorderly, but yes, I think.
Q. We won't be striving for that.
A. Okay.
Q. The court reporter is transcribing everything, so the most important caveat is to enable her to get a clean written record by you and I avoiding talking over each other.
So if for any reason I start to ask a question before you finish, let me know and I'll be sure to pause and let you complete your answer.
And likewise, if I'm in the middle of asking a question, even if it's pretty obvious where I'm going, if you would let me finish it and get it all out on the record, that would also be helpful for the court reporter.

Page 18

1   the organizational structure in May of 2016 when Snow
2   Covered Capital made its loan to Lucky Dragon, LP?
3       A. I believe so. It's not dated here, but I
4   believe so.
5       Q. Is the organizational structure on
6   Exhibit 112 still true and correct today?
7       A. I don't know.
8       Q. We'll come back to that briefly.
9           You indicated in preparing for your
10  deposition that you looked at some documents. Can you
11  describe what those documents were generally?
12      A. I couldn't tell you exactly. I can tell you
13  perhaps categories. They're all within the ambit of
14  the litigation, all Bates marked or whatever you call
15  it, number 1, broadly.
16          Broadly, documents that related to the
17  lending and communications that relate to the loan
18  itself, e-mails that I am named on, primarily between
19  Rob Heller, between Andy Fonfa and David Jacoby and a
20  few others. And some other documents that would be
21  letters and things of that nature that may or may not
22  be e-mails. They may be communications, I believe,
23  among those people, but not -- I can't testify
24  exclusively among those, but generally among those.
25      Q. Are you familiar with the pleadings that have

Page 19

1   been filed in this case, in particular the ones that
2   have been filed with your name on it by Mr. Santoro?
3       A. Yes.
4       Q. There was an answer filed in this case on
5   your behalf at the end of December 2019. Did you
6   review that before it was filed?
7       A. I believe so, yes.
8       Q. As you sit here today, what do you understand
9   to be the core reason for this lawsuit?
10          MR. SANTORO: Objection. Vague and
11  overbroad.
12          THE WITNESS: Snow Covered Capital attempting
13  to sue those defendants for the difference in the
14  value achieved in the bankruptcy sale and the amount
15  of the loan itself.
16  BY MR. FULTON:
17      Q. And as you understand it, what led to you
18  being named as a defendant in this case?
19          MR. SANTORO: Objection. Lack of foundation.
20  Vague.
21          THE WITNESS: The triggering of the
22  bankruptcy declaration in order to try to achieve
23  maximum value for the asset.
24  BY MR. FULTON:
25      Q. And do you recall when Snow Covered Capital

Page 20

1   first reached out to you to request payment on the
2   guaranty that you signed?
3       A. I don't recall.
4       Q. Have you ever personally paid anything toward
5   any obligation that you might have under the guaranty
6   that you signed for the benefit of Snow Covered
7   Capital?
8       A. I don't believe I have an obligation.
9       Q. And as a result, you haven't paid anything;
10  correct?
11          MR. SANTORO: Objection. Vague.
12          THE WITNESS: I wouldn't even have a basis
13  presented to me that made a claim, I don't believe,
14  that is sustainable. I think that's why we're in
15  litigation.
16  BY MR. FULTON:
17      Q. How would you summarize the reason why Snow
18  Covered Capital isn't entitled to recover any moneys
19  from you? How would you put that in sort of a
20  big-picture one or two sentence?
21          MR. SANTORO: Objection. Calls for a legal
22  conclusion. Vague and overbroad.
23          THE WITNESS: Because they created their own
24  shortfall. My view is they did it themselves, they
25  dumped the asset. So why would I be responsible for

Page 21

1   their actions.
2   BY MR. FULTON:
3       Q. Where do you work today, sir?
4       A. I have my own company.
5       Q. And what's the name of that company?
6       A. Gaming Asset Management.
7       Q. How long have you had your own company?
8       A. Late 2010. I think it was formed late 2010,
9   early 2011. I don't know when the paperwork was
10  finished.
11      Q. Has your work managing, owning your own
12  business, Gaming Asset Management, been your primary
13  form of vocation since 2010?
14      A. "Vocation"?
15      Q. As opposed to saying, yeah, but in the middle
16  of that I stopped and worked for three years for
17  company X. I'm just basically trying to grab the last
18  10 years in one bite from a job perspective.
19      A. I don't know how to -- "vocation." I
20  don't -- what does that mean?
21      Q. Have you worked anywhere else in the last
22  10 years since 2010?
23      A. I have worked on other things that were my
24  own, but -- so I don't even know how to define
25  "vocation." So I work for myself as relates to my

Page 50

1  Q. Is Exhibit 46 a true and correct copy of the
2  construction agreement between Lucky Dragon, LP, and
3  Snow Covered Capital as best you can tell looking at
4  it today?
5  A. Best I can tell, yes.
6  Q. Do you recall reviewing the construction loan
7  agreement, in whole or in part, at or near the time
8  that it was entered into in May of 2016?
9  A. Yes, I believe so, yes.
10 Q. Was Lucky Dragon authorized to enter into the
11 construction loan agreement?
12    MR. SANTORO: Objection. Calls for a legal
13 conclusion.
14    THE WITNESS: I believe so.
15    (Exhibit 47 was previously marked for
16 identification.)
17 BY MR. FULTON:
18 Q. Take a look at Exhibit 47. Do you recognize
19 Exhibit 47?
20 A. No.
21 Q. Do you believe you have ever seen Exhibit 47
22 before today?
23 A. Please repeat the question.
24 Q. Do you think you've ever seen this Exhibit 47
25 before today?

Page 51

1  A. I don't think so.
2  Q. Did you know before today that the loan from
3  Lucky Dragon -- sorry -- from Snow Covered Capital to
4  Lucky Dragon was comprised of a $30 million
5  construction loan and a $15 million line of credit?
6  A. Yes.
7  Q. Do you recognize Exhibit 48?
8  A. No.
9  Q. Who at the Lucky Dragon would have been
10 responsible for reviewing the deal documentation for
11 the loan of $45 million from Snow Covered Capital to
12 Lucky Dragon?
13 A. Andy Fonfa, lawyers for Lucky Dragon, David
14 Jacoby.
15 Q. Were you aware at the time in May of 2016
16 that the Lucky Dragon was going to make a loan of
17 $45 million from Snow Covered Capital?
18 A. Yes. They wouldn't have made a loan. You
19 said made a loan. They might have accepted. I don't
20 know what you would call it, but I think you misstated
21 the question.
22 Q. Were you aware in May of 2016 that Snow
23 Covered Capital was going to make a loan to the
24 Lucky Dragon pursuant to this construction loan
25 agreement that we've looked at earlier?

Page 52

1  A. Yes.
2     (Exhibit 49 was previously marked for
3  identification.)
4  BY MR. FULTON:
5  Q. Take a look at Exhibit 49. Do you recognize
6  Exhibit 49?
7  A. No.
8  Q. Do you recognize Mr. Fonfa's signature on
9  page 32 of the document bearing Bates number
10 DEFS000262?
11 A. I see it written here, if that's -- I don't
12 know enough to know, so -- I believe it's his
13 signature.
14 Q. Have you ever looked through the construction
15 deed of trust that's been marked as Exhibit 49 prior
16 to seeing it?
17 A. Not that I recall.
18 Q. Do you have the document marked as Exhibit 50
19 in front of you?
20 A. Yes.
21    (Exhibit 50 was previously marked for
22 identification.)
23 BY MR. FULTON:
24 Q. Do you recognize Exhibit 50?
25 A. I think so.

Page 53

1  Q. Turn to the last page of Exhibit 50 bearing
2  Bates numbers DEFS000190. Do you see signatures on
3  that last page?
4  A. Yes.
5  Q. Is that your signature?
6  A. Yes.
7  Q. Do you recall exercising the recourses
8  obligations guaranty on or about May 3rd, 2016?
9  A. No.
10 Q. Do you have any reason to believe that you
11 did not execute this recourse obligations guaranty
12 that we've marked as Exhibit 50?
13 A. No.
14 Q. In May of 2016, what was your understanding
15 as to what you were guaranteeing as part of the loan
16 from Snow Covered Capital to Lucky Dragon?
17    MR. SANTORO: Objection. Calls for a legal
18 conclusion. Overbroad. The documents speak for
19 themselves.
20    THE WITNESS: That the entity would behave in
21 accordance with the specifications of the loan
22 documents.
23 BY MR. FULTON:
24 Q. Did you understand, in May of 2016, that the
25 recourse obligations guaranty could impose upon you

Page 54

1    personally in certain circumstances a financial
2    obligation to pay money to Snow Covered Capital?
3        MR. SANTORO: Same objections.
4        THE WITNESS: In certain circumstances? I
5    mean, at the time that this was signed I never
6    anticipated I'd be in that situation.
7    BY MR. FULTON:
8        Q. Fair enough.
9        But did you have an understanding that the
10   very nature of the guaranty was to have some kind of
11   promise in place that under certain circumstances you
12   would personally have an obligation to make payments
13   to Snow Covered Capital?
14       MR. SANTORO: Same objections.
15       THE WITNESS: I'm aware of constructions
16   around bad boy clauses that may result in issues, but
17   there was no intention to violate those bad boy
18   clauses.
19   BY MR. FULTON:
20       Q. You would agree that the purpose of a
21   guaranty is for an individual to make promises to make
22   payments to a lender in certain circumstances as an
23   inducement for that lender to enter into the loan
24   transaction?
25       MR. SANTORO: Objection. Vague. Calls for a

Page 55

1    hypothetical.
2        THE WITNESS: I didn't make pledges to induce
3    a lender. The lender would make his own decision
4    about whether he thought the value of the asset was
5    recoverable. So I had no intention of breaching any
6    of the bad boy clauses.
7    BY MR. FULTON:
8        Q. Have you had experience with personal
9    guarantees in the past in your business dealings,
10   either as a recipient or as a guarantor?
11       A. No, not that I can think of.
12       Q. This transaction was the first time that you
13   had encountered a personal guarantee in a business
14   deal?
15       MR. SANTORO: Objection. Vague.
16       THE WITNESS: That's a lot broader than me
17   personally. I mean, I'm aware generally, but I never,
18   never, can't say never -- I cannot recall a situation
19   that I provided a personal guarantee to induce someone
20   to make a loan.
21   BY MR. FULTON:
22       Q. Can you recall a circumstance other than the
23   Lucky Dragon in which you have provided a personal
24   guarantee as part of a business transaction?
25       MR. SANTORO: Objection. Vague.

Page 56

1        THE WITNESS: No. I avoid, to use the term,
2    like the plague, would be not proper in the context of
3    today, but I avoid personal guarantees whenever I
4    possibly can.
5    BY MR. FULTON:
6        Q. And since the Lucky Dragon transaction, have
7    you entered into any other personal guarantees in
8    other business deals?
9        MR. SANTORO: Objection. Vague.
10       THE WITNESS: I don't believe so.
11   BY MR. FULTON:
12       Q. Were you represented individually by counsel
13   in connection with executing the recourse obligations
14   guaranty?
15       A. I don't recall.
16       Q. Did you read the recourse obligations
17   guaranty before you signed it?
18       A. Yes, I reviewed it.
19       Q. You had indicated that the recourse
20   obligations guaranty made reference in some way to
21   what you described as "bad boy clauses." What did you
22   mean by that?
23       A. Things that would be -- we're talking about
24   the construction contract, and as it relates to that,
25   the bad boy clauses, in my understanding around that,

Page 57

1    related to moneys spent outside of the purpose of
2    building the building; that would be a bad boy clause
3    of -- a bad boy clause would relate to fraud, relate
4    to acts of embezzlement, you know, those are a series
5    of things that logically a lender would be concerned
6    about as it relates to constructing the building and
7    the source of the money, because the completion of the
8    building would represent the asset that the lender
9    would then have. So if money leaked outside of the
10   asset and the lender at the end of the day had its
11   first position on the building, any moneys that leaked
12   out of that would be bad boy related.
13       Q. Turn, if you would, to the second page of
14   Exhibit 50. By the way, was this recourse obligations
15   guaranty a document you looked over in preparation for
16   your deposition?
17       A. I believe so, yes.
18       Q. Do you see paragraph 1.1 at the top of
19   page 2?
20       A. Yes.
21       Q. It says:
22           "Each guarantor hereby irrevocably and
23       unconditionally guaranties to lender and its
24       successor and assigns the payment in
25       performance of the guarantied obligations as

Page 58

1  defined herein."
2      Do you see that?
3  A. Yes.
4  Q. And then the next provision in 1.2 defines
5  that term "guarantied obligations." Do you see that?
6  A. (Document review.) Yes.
7  Q. So, to use your example of a bad boy
8  provision, 1.2(a), which is on the second page of the
9  guaranty, says that -- and I'm going to summarize, so
10 feel free to correct it if you don't feel I'm doing so
11 accurately.
12     Should Snow Covered Capital suffer any losses
13 because of fraud or material misrepresentation by
14 Lucky Dragon, that you as the guarantor agree to pay
15 those losses; is that how you would read
16 section 1.2(a)?
17     MR. SANTORO: Objection. Calls for a legal
18 conclusion. The document speaks for itself.
19     THE WITNESS: That's the plain reading of the
20 document.
21 BY MR. FULTON:
22 Q. Similarly, under 1.2(c), if Snow Covered
23 Capital incurs losses as a result of the failure of
24 the Lucky Dragon to pay any taxes that you as the
25 guarantor are agreeing to make those payments, is that

Page 59

1  how you would read 1.2(c)?
2      MR. SANTORO: Same objections.
3      THE WITNESS: I don't know.
4  BY MR. FULTON:
5  Q. Do you have an understanding of what 1.2(c)
6  relates to, how that would work in practice?
7  A. Not fully.
8  Q. What is your understanding, as best as you
9  can tell from -- again, not asking for a legal
10 interpretation, but as the person who signed the
11 contract, what is your understanding of how 1.2(c)
12 operates?
13     MR. SANTORO: Same objections.
14     THE WITNESS: I don't know. I mean, it would
15 depend on circumstances, depend on whether protections
16 are accorded and they weren't paid. I think there may
17 be a lot of different ways, but I would have to talk
18 to counsel.
19 BY MR. FULTON:
20 Q. 1.2D indicates that -- I'm going to
21 summarize, so feel free to correct me if you don't
22 feel it's an accurate summary -- that if Snow Covered
23 Capital suffers any losses as a result of paying legal
24 expenses as a result of a bankruptcy proceeding of the
25 Lucky Dragon, that you as the guarantor agree to pay

Page 60

1  those. Is that how you would understand 1.2D?
2      MR. SANTORO: Same objections.
3      THE WITNESS: No. I think there are a lot --
4  there may be circumstances that would not obligate me
5  to do that.
6  BY MR. FULTON:
7  Q. How do you understand the obligations that
8  you were undertaking, if any, in section 1.2D?
9      MR. SANTORO: Same objections.
10     THE WITNESS: My primary concern here was
11 that we complete the building. The building
12 completion would represent an asset that would have
13 approximately 150, 160 million dollars of,
14 quote-unquote, investment value in it, and within the
15 four corners of what the responsibility, primary
16 responsibility was to behave correctly and then
17 deliver an asset that had value clearly well above the
18 loan, and so the -- my primary focus here, my
19 intention -- I had no intention to trip any of these
20 bad boy clauses at the time that we were building this
21 building, at the time I signed the agreement.
22 BY MR. FULTON:
23 Q. What did you understand you were agreeing to
24 in section 1.2D at the time that you signed the
25 contract?

Page 61

1      MR. SANTORO: Same objections.
2      THE WITNESS: That if these bad boy clauses
3  here, if the fraud, material misrepresentation,
4  physical waste, et cetera, if the development of this
5  property wasn't completed, therefore there wasn't a
6  very valuable asset created because of something that
7  was done incorrectly, fraud, misrepresentation,
8  willful misconduct, et cetera, and I believe that I
9  agreed to provide a completion guaranty, a limited
10 amount of completion guaranty to get the asset built,
11 and that would be the primary way that I would assure
12 myself that there would not be exposure beyond the
13 value of the building built.
14     As I read that, that's the way that I was --
15 that if I didn't get the building built, so,
16 therefore, there was no asset and there was no place
17 to have a first lien against that very valuable asset
18 because of fraud or material misrepresentation or
19 money leaking or something of that nature, I could be
20 exposed to that, but I didn't pay attention, quite
21 frankly, to the bankruptcy process because there was
22 no intention to declare bankruptcy.
23     So I didn't think that I would have exposure
24 to legal fees about chasing the entity for fraud or
25 any of the other bad boy clauses. So I read it, but I

### Page 62

1  didn't anticipate that I would ever have to defend
2  myself about it.
3  BY MR. FULTON:
4     Q. Turn the page, if you would, to page 3 of the
5  guaranty, the middle paragraph there that begins with
6  "notwithstanding." Do you see that paragraph?
7     A. Yes.
8     Q. There's a subheading within it that's a
9  capital B inside of parentheses. Do you see that?
10 It's right in the middle of the page.
11    A. Yes.
12    Q. It says:
13        "Guarantors shall be liable jointly and
14     severally for the full amount of the secured
15     obligation in the event that the premises or
16     any part thereof becomes an asset in the
17     voluntary bankruptcy or voluntary insolvency
18     proceeding under the U.S. Bankruptcy Code."
19     Do you see that phrase?
20    A. Yes.
21    Q. Did you have an understanding that, if the
22 Lucky Dragon filed bankruptcy, that that would trigger
23 an obligation by you and the other guarantors to be
24 liable for the full amount of the secured obligations?
25    MR. SANTORO: Objection. Calls for a legal

### Page 63

1  conclusion. Document speaks for itself.
2     THE WITNESS: In any process or legal
3  proceedings there are always issues and beliefs. My
4  belief was that the value of the asset was such that,
5  even if I exposed the potential of a difference
6  between the liquidation value of the building and the
7  obligation, that those -- the value of the building
8  was well above that.
9     So when the decision was made, then that was
10 with the understanding and knowledge that valuations
11 had been presented that were well above whatever the
12 total liquidation plus fees would be relating to the
13 Snow Covered Capital loan.
14 BY MR. FULTON:
15    Q. So at the time you signed the guaranty, the
16 thinking that you are having, if I'm understanding it
17 right, is that even if the worst case happens and the
18 property is put into bankruptcy, the value of the
19 property is going to be enough that whenever it's sold
20 or disposed of, that will pay the debt and any other
21 moneys that could be argued to be your responsibility
22 under this guaranty. Is that kind of a fair summary?
23    MR. SANTORO: Objection. Calls for a legal
24 conclusion. The document speaks for itself.
25    THE WITNESS: I think the question needs to

### Page 64

1  be asked, I think, within the context of the timing of
2  the signing in May of 2016. I had no intention of
3  violating any of the bad boy clauses, and I felt that
4  my personal guarantee related to getting it built, and
5  from then on, first of all, never thought of a
6  bankruptcy, thought the business plan was good,
7  thought everything would go quite well.
8     Fast-forward to the time at which the loan
9  was coming due, it's a different time and place, and
10 I'm looking at valuations real time after the building
11 is built, and I still felt that the best thing to do
12 was to have enough time to realize its value.
13    So I was aware, certainly, when I signed it.
14 No intention, limiting my exposure to 5 million to get
15 the building built, and I thought that that would
16 suffice. It didn't at a later time. Looking at
17 valuations, look at a building. It's a good building.
18 The business plan may have failed, but it was a
19 terrific asset and a good location. So I felt there
20 was value there for the lender.
21    Q. We focus the time period on let's say the
22 60 days before the bankruptcy filing. Did you revisit
23 this idea that, should Lucky Dragon file for
24 bankruptcy, that that could trigger, if not liability,
25 then certainly claims against you under this guaranty?

### Page 65

1     MR. SANTORO: Objection. Calls for a legal
2  conclusion. Document speaks for itself.
3  BY MR. FULTON:
4     Q. I'm not asking, by the way, for you to relay
5  contents of your communications with your lawyers. So
6  make that clear, not that Mr. Santoro wouldn't have
7  interjected quickly.
8     MR. SANTORO: I would have.
9     THE WITNESS: The decision was made in the
10 context of my knowledge of a Snow Covered Capital
11 valuation of $60 million. So my decision, as
12 gut-wrenching as it was, was related to a valuation by
13 the lender himself, and I thought the valuation, the
14 selling value was well above that, and that's the
15 context I made the decision in.
16 BY MR. FULTON:
17    Q. So you did take some time to think about the
18 risk that the bankruptcy might trigger claims of
19 liability under the guaranty right before the filing,
20 but concluded that, based on your assessment of the
21 facts out there related to the value of the property,
22 that there was still enough value in the property to
23 prevent you from having to personally write a check to
24 cover any of those obligations?
25    MR. SANTORO: Same objections.

Page 250

1   Q. On paragraph numbered 1 of the letter on
2   page 2, it indicates that the Clark County Treasurer's
3   Office shows that there are past due real property
4   taxes owed on the Lucky Dragon Hotel. Did you
5   understand that to be true in March 2018?
6   A. I believe so.
7   Q. In response to this demand, did you take
8   steps to pay the real property taxes owed on the
9   Lucky Dragon?
10  A. No.
11  Q. Paragraph 2 states that on February 16th, the
12  Lucky Dragon Hotel & Casino, LLC, filed Chapter 11,
13  and on February 21st, 2018, the Lucky Dragon, LP,
14  filed Chapter 11. It makes a demand that you make
15  arrangements to reimburse Snow Covered Capital for its
16  legal costs and expenses incurred as a result of the
17  bankruptcy proceedings.
18      Did you contact Snell & Wilmer or Snow
19  Covered Capital and make any arrangement to pay for
20  legal costs associated with the bankruptcy proceeding?
21  A. Did I personally? No.
22  Q. Did anyone on your behalf reach out to Snow
23  Covered Capital or Snell & Wilmer and offer to
24  reimburse legal expenses incurred by Snow Covered
25  Capital in connection with the bankruptcy proceeding?

Page 251

1   A. Not that I know of.
2   Q. Paragraph 3 indicates that under Section 1.2
3   of the guaranty, the guarantors are jointly and
4   severally liable for the full amount of the secured
5   obligations as a result of the borrowers' and
6   Lucky Dragon Hotel & Casino's bankruptcy proceedings,
7   and it asks you to make contact with Snell & Wilmer to
8   arrange to pay the full amount of the secured
9   obligations.
10      Did you or anyone on your behalf in response
11  to this letter reach out to Snell & Wilmer or Snow
12  Covered Capital and make arrangements to make any
13  payments toward the amount of the secured obligations?
14  A. Not that I know of.
15  Q. In response to this communication to you on
16  March 2nd, 2018, did you take any actions that you
17  contend constituted an attempt to comply with the
18  obligations set forth in the recourse obligations
19  guaranty?
20      MR. SANTORO: Objection. Calls for a legal
21  conclusion.
22      THE WITNESS: I didn't believe that I had an
23  obligation. And I believe the value of the asset, if
24  properly dealt with, would have covered the
25  shortfalls.

Page 252

1   BY MR. FULTON:
2   Q. And so as a result, does that mean that you
3   did or did not take any actions to attempt to comply
4   with any obligations in the recourse obligations
5   guaranty?
6       MR. SANTORO: Objection. Calls for a legal
7   conclusion. Asked and answered.
8       THE WITNESS: I hired my lawyers to represent
9   me in objecting to the demands.
10      MR. FULTON: Let's go off the record for a
11  minute.
12      (Off record.)
13  BY MR. FULTON:
14  Q. Earlier in the day, you indicated that in
15  evaluating the Lucky Dragon's operations, you had math
16  folks and operational experts from outside the casino
17  come in and look at the performance of the hold on the
18  gaming operations, try to figure out what was going
19  wrong with the model.
20      What were the names of the outside persons
21  that you retained to come in and look at the
22  Lucky Dragon?
23  A. I don't remember.
24  Q. Do you remember any of them on the math side
25  particularly that came in and did some kind of

Page 253

1   mathematical analysis?
2   A. I don't know which one was selected. There's
3   a guy by the name of Klebenau. I think it's Klebenau.
4       MR. SANTORO: Spell that.
5       THE WITNESS: K-l-e-b-e-n-a-u.
6   BY MR. FULTON:
7   Q. You said he was one of the math guys?
8   A. I believe so. I'm going back to my memory.
9   I drew people in, turned them over to Jacoby to manage
10  the process. I believe it was two or three different
11  people who had expertise and a couple that had written
12  articles about hold percentage and mathematics of
13  gaming, et cetera.
14  Q. And on the operational side, the folks that
15  observed the mechanics of the betting and the
16  interactions of the players, do you remember the names
17  of any of the outside persons you brought in for that
18  aspect of the analysis?
19  A. No. I had talked to some of my people
20  internally, LVS, that I knew, looked at some names and
21  things, and turned them over to the Jacoby to then
22  vet.
23  Q. Did you say LBS [sic]?
24  A. Las Vegas Sands.
25  Q. Oh, got it, LVS. I'm sorry.

64 (Pages 250 to 253)

Page 254

1    That's it. Pass the witness.
2    MR. SANTORO: No questions.
3    MR. GARDBERG: No questions.
4    (End of proceedings at 5:28 p.m.)
5
6         *    *    *    *    *

Page 255

1         DECLARATION OF DEPONENT
2   PAGE LINE  CHANGE     REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19       I, WILLIAM P. WEIDNER, deponent herein, do
    hereby certify and declare under penalty of perjury
20  the within and foregoing transcription to be my
    deposition in said action; that I have read, corrected
21  and do hereby affix my signature to said deposition.
22
23       _____
24       WILLIAM P. WEIDNER, Deponent
25       Date:_____

Page 256

1        I, the undersigned, a Certified Court
2   Reporter of the State of Nevada, Registered
3   Professional Reporter, and Certified Realtime
4   Reporter, do hereby certify:
5        That the foregoing proceedings were taken
6   before me at the time and place herein set forth; that
7   any witnesses in the foregoing proceedings, prior to
8   testifying, were duly sworn; that a record of the
9   proceedings was made by me using machine shorthand
10  which was thereafter transcribed under my direction;
11  that the foregoing transcript is a true record of the
12  testimony given.
13       I further certify I am neither financially
14  interested in the action nor a relative or employee
15  of any attorney or party to this action.
16       IN WITNESS WHEREOF, I have this date
17  subscribed my name.
18  Dated: 03-13-2020
19
20       [signature]
21
22  JANET C. TRIMMER, RPR, CRR
    NV CCR No. 864