**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

SNOW COVERED CAPITAL, LLC,          )
          Plaintiff                 )          **CASE NO. 2:19-cv-00595-APG-NJK**
                                    )
          V.                        )
                                    )
WILLIAM WEIDNER, ANDREW             )
FONFA, And DAVID JACOBY,            )          **SCC'S REVISED DRAFT OF JOINT**
                                    )          **PROPOSED PRETRIAL ORDER**
          Defendants.               )

---

**After pretrial proceedings in this case,**

**IT IS ORDERED:**

### I.          NATURE OF THE ACTION.

The parties disagree regarding the description of the nature of the action and have submitted their respective descriptions below.  Section A is Plaintiff's view and Section B is Defendants' view.

**A.          PLAINTIFF'S VIEW:**

**1.  THE PARTIES.**

Plaintiff Snow Covered Capital, LLC ("SCC") is a California limited liability company created for the sole purpose of making $45 million in loans to the Lucky Dragon Hotel & Casino project described below.

Defendants Andrew Fonfa[1], William Weidner and David Jacoby (the "Guarantors" or the "Guarantor Defendants") were the promoters of the Lucky Dragon Hotel & Casino project in Las Vegas.  Each Guarantor executed a "Recourse Obligations Guaranty" (the "Guaranty") in favor of SCC that SCC required before it would make the $45 million loans it made to help fund that project.  That Guaranty is at the center of this litigation.

---

[1] Defendant Fonfa died in 2020 and his probate estate has been substituted in for him (ECF No. 169).

Former Defendant Lucky Dragon, LP ("LD LP") is a Nevada limited partnership that owned the Lucky Dragon Hotel & Casino property (the "Property"), and was also the borrower of the SCC loans. It was managed from its formation until its conversion into a Chapter 7 bankruptcy debtor[2] by Las Vegas Economic Impact Regional Center, LLC ("LVEIRC"), a Guarantor-controlled Nevada LLC that served as LD LP's general partner.  Lucky Dragon LP's limited partners were Chinese nationals who invested in LD LP under the federal EB-5 program.

**2.  THE ACTION.**

SCC brings this breach of guaranty action against Messrs. Weidner, Jacoby and Fonfa – alleging that those Guarantors have failed to honor their Guaranty in any respect.  Count Two of the Plaintiff's Complaint (ECF No. 1) states SCC's claims against the Guarantor Defendants for "Breach of Contract and Application for Deficiency Judgment Against the Guarantor Defendants."

All of the affirmative defenses asserted by the Guarantor Defendants in this action have been abandoned or stricken by court orders.[3]

There are no counter claims, third-party claims, or crossclaims.

SCC's claims against former Defendant LD LP have been settled as part of a court-approved settlement involving disputes in bankruptcy court as well as in this action.

**3.  RELIEF SOUGHT BY PLAINTIFF SCC.**

This is a damages action and Plaintiff SCC seeks to recover all damages, attorneys' fees, interest, and costs to which it is entitled under the Guaranty and/or the applicable law.   The damages SCC seeks to recover include, but are not limited to, the deficiency between what is owed

---

[2] The LD LP bankruptcy was filed as a Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court").  It was converted to a Chapter 7 bankruptcy on November 27, 2018 and remains pending before Judge Nakagawa in Case No. 18-10850-mkn.

[3] *See* ECF No. 114 (Judge Koppe's Report and Recommendation re Motion to Strike Fonfa Answer); ECF No 120 (Judge Dorsey adopting Judge Koppe's Report re the Fonfa  Answer); ECF No. 116 (Judge Koppe's Report and Recommendation re Motion to Strike the Weidner/Jacoby Answer);  and ECF No. 124 (Judge Dorsey adopting Judge Koppe's Report re the Weidner/Jacoby Answer).  *Snow Covered Capital, LLC* v. *Weidner, et al.,*  2022 WL 2819733 at *1-3 (D. Nev. July 15, 2022) (granting summary judgment on the Defendants' remaining affirmative defenses).

on the debt and the amount for which the Property was sold in an October 30, 2018 foreclosure sale.

### 4. THE PARTIES' CONTENTIONS.

Plaintiff SCC contends that this is a simple and straightforward breach of contract action. Under the governing Nevada law then, SCC need only prove: (1) the existence of a valid contract; (2) a breach by the defendants; and (3) damage as the result of the breach. SCC has pleaded all of those elements in its Complaint and, to the extent required, expects to prove each element at trial.

Defendants do not contest the first two of the three elements of a breach of contract claim. More specifically, they do not contend that the Guaranty and the related documents are invalid. They also do not contend that they have performed their obligations under the Guaranty. Defendants do contend that SCC is not entitled to the deficiency judgment portion of SCC's claimed damages.

### B. DEFENDANTS' VIEW:

Snow Covered Capital filed this action on April 8, 2019, as an "Application for Deficiency Judgment." (ECF No. 1 at 1). As this Court has found, SCC's entitlement to damages pursuant to that judgment must be analyzed under NRS Chapter 40. (*See, e.g.*, ECF Nos. 177, 180, 243, and 264). As this Court has explained, "Before awarding such a judgment, a court must 'hold a hearing and . . . take evidence presented by either party concerning the fair market value of the property sold as of the date of the foreclosure sale.'" (ECF No. 243 at 2 quoting Nev. Rev. Stat. § 40.457(1)).

In calculating the amount of indebtedness, this Court stated:

> Indebtedness is defined in Nevada Revised Statute (NRS) 40.451 as:
> the principal balance of the obligation secured by a mortgage or other lien on real property, together with all interest accrued and unpaid prior to the time of foreclosure sale, all costs and fees of such a sale, all advances made with respect to the property by the beneficiary, and all other amounts secured by the mortgage or other lien on the real property in favor of the person seeking the deficiency judgment.

(ECF No. 180 at 2).

3

1
2
3
4
5

"Fair market value is generally defined as the price which a purchaser, willing but not obliged to buy, would pay an owner willing but not obliged to sell, taking into consideration all the uses to which the property is adapted and might in reason be applied." *Unruh v. Streight*, 96 Nev. 684, 686, 615 P.2d 247, 249 (1980). The fair market value of the security in a deficiency judgment action is "determined on the date of foreclosure." *Unruh*, 615 P.2d at 248.

6
7
8
9

The party seeking a deficiency judgment has the burden of proof for every element of a deficiency judgment including the fair market value of the property. *Branch Banking & Tr. Co. v. Desert Canyon Phase II, LLC*, No. 212CV01463JCMPAL, 2016 WL 9108912, at *2 (D. Nev. Mar. 14, 2016); *Miller v. Assurity Life Ins. Co.*, 2014 WL 859230 at *2–3 (Nev. Feb. 28, 2014).

10
11
12

Thus, this trial is to determine what amount was actually owed to SCC as of the date of foreclosure, the fair market value of the Property on that same date, and whether a deficiency exists between those two amounts. SCC has the burden of proof for each of those elements.

13

## II.    STATEMENT OF JURISDICTION.

14

### A.    SUBJECT MATTER JURISDICTION.

15

#### 1.    STIPULATED STATEMENT OF SUBJECT MATTER JURISDICTION.

16
17
18

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the citizenship of Plaintiff SCC differs from the citizenship of the Defendants and the amount in controversy exceeds $75,000 excluding interest and costs.

19
20

#### 2.    PLAINTIFF'S ADDITIONAL STATEMENT OF SUBJECT MATTER JURISDICTION.

21
22
23
24
25
26
27

This Court also has subject matter jurisdiction under 28 U.S.C. §1334 because, at the time of filing: (a) this action arose in or was related to a case arising under Title 11, namely the bankruptcy of former Defendant LD LP; (b) the adjudication of the amount of SCC's claim against LD LP is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O); (c) the Bankruptcy Court terminated the automatic stay to allow SCC to initiate litigation against LD LP for the purpose of liquidating its claim against the LD LP estate; (d) the outcome of this litigation against the Guarantors could reduce the Plaintiff's claim against the LD LP estate; and

28

(e) the outcome of the litigation against LD LP has direct implications for the claims adjudication process in the Bankruptcy Court.

### 3. DEFENDANTS' VIEW.

Defendants disagree with and object to Plaintiff's insertion of the additional statement of subject matter jurisdiction.

## B.   STIPULATED STATEMENT OF PERSONAL JURISDICTION.

This Court has personal jurisdiction over Defendants because Defendants are residents of Nevada or have had contacts with Plaintiff in Nevada that gave rise to the claims in this lawsuit.

## C.   VENUE.

### 1. STIPULATED STATEMENT OF VENUE.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the property that is the subject of the action, the Lucky Dragon Hotel and Casino, is situated in this District at 300 West Sahara Avenue, Las Vegas, Nevada, Parcel Number 162-04-816-001, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

### 2. PLAINTIFF'S ADDITIONAL STATEMENT OF VENUE.

Venue in this Court is also proper under 28 U.S.C. § 1409 because this action is related to the LD LP bankruptcy filed in this District.

### 3. DEFENDANTS' VIEW.

Defendants disagree with and object to Plaintiff's insertion of the additional statement of venue.

## D.   OTHER RELEVANT MATTERS STIPULATED TO BY THE PARTIES.

No party has challenged this Court's subject matter jurisdiction, its jurisdiction over the Defendants, or the venue of this litigation.

On June 29, 2022, this matter was transferred to this Court (*viz.,* to Judge Andrew P. Gordon) by random assignment. *See* ECF No. 262.

### III.    THE PARTIES' STATEMENTS OF FACTS.

The parties have reached limited agreement on facts that are admitted and require no proof. Part of the disagreement between the parties relates to contesting facts while another portion of the disagreement relates to the characterization of the facts and/or relevance of certain facts. Given the limited agreement, the parties submit their respective view of the facts and each side has indicated where the facts, as described by the other party, are stipulated. These respective positions are set forth below and are incorporated by reference in Section V below when the facts haven't been Stipulated and should be determined at trial.

**A.    PLAINTIFF'S VIEW.**

   **1.  PARTIES.**

1.      Plaintiff Snow Covered Capital ("SCC") is a California limited liability company with its principal place of business in San Francisco, California. **(Not Stipulated)**

2.      The members of SCC are three California limited liability companies: Nellie, LLC; 1421 Capital, LLC and Associated Capital, LLC. The member managers of these three LLC's are individual citizens of California or trusts whose trustees are citizens of Delaware and Alabama. **(Not Stipulated)**

3.      SCC was formed for the sole purpose of making the $45 million in loans to the Lucky Dragon Hotel & Casino project described above. **(Not Stipulated)**

4.      Defendant William Weidner was a resident and citizen of Nevada at the time of the filing of the above-captioned lawsuit. **(Stipulated)**

5.      Defendant Andrew Fonfa was a resident and citizen of Nevada at the time of the filing of the above-captioned lawsuit. **(Stipulated)**

6.      Defendant Fonfa died on July 15, 2020 [ECF No. 152]. **(Stipulated)**

7.      His probate estate was subsequently substituted in as a party defendant upon motion by SCC [ECF No. 163] and an order of this Court [ECF No. 169]. **(Stipulated)**

8.      His personal representative in the probate estate is his widow, Jodi Fonfa, and she now represents the Andrew Fonfa probate estate in this action. **(Not Stipulated)**

6

9.    In Section 1.3 of the subject Guaranty, Andrew Fonfa agreed that the subject Guaranty would continue to be effective after his death and "be binding upon [his] estate and [his] legal representatives and heirs."  Accordingly, the Andrew Fonfa probate estate, Jodi Fonfa, and the heirs of that estate (Evan and Haley Fonfa) continue to be bound by the Guaranty and the need to perform the Guaranteed Obligations and other obligations defined in the Guaranty. **(Not Stipulated)**

10.    Defendant David Jacoby was a resident and citizen of Texas at the time the above-captioned lawsuit was filed but was a resident of Nevada at the time of most of the events at issue in the above-captioned lawsuit. **(Not Stipulated)**

11.    Former Defendant Lucky Dragon, L.P. ("LD LP") is a Nevada limited partnership, the former owner of the Lucky Dragon Hotel & Casino property, and the borrower of the $45 million in SCC loans made to Lucky Dragon L.P. **(Not Stipulated)**

12.    The general partner of Lucky Dragon, L.P. was a Nevada limited liability company named Las Vegas Economic Impact Center, LLC ("LVEIRC"). **(Stipulated)**

13.    Lucky Dragon, L.P.'s limited partners were Chinese nationals who had invested in the Lucky Dragon Hotel & Casino project through the federal EB-5 program. **(Not Stipulated)**

14.    The Guarantor Defendants directly and/or indirectly owned and controlled LVEIRC. **(Not Stipulated)**

15.    Each of the Guarantors have represented and warranted to SCC, in the Guaranty, that it is "the owner and holder of a direct or indirect interest (beneficial, contractual or otherwise) in LD LP, and has received or will receive direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations."  *See* Guaranty §5.1; Whereas Clause. **(Not Stipulated)**

## 2.    THE SCC LOANS.

16.    On May 3, 2016, SCC agreed to loan, and Lucky Dragon L.P. agreed to borrow, to be indebted to, and to repay SCC for $45 million in loans. Those loan terms were memorialized in, primarily: (1) a Construction Loan Agreement; (2) a secured Construction Loan Promissory Note

payable to SCC in the original principal amount of $30,000,000; (2) a secured Line of Credit Promissory Note payable to SCC in the original principal amount of $15,000,000; and (4) a Construction Deed of Trust (With Assignment of Leases and Rents, Security Agreement and Fixture Filing) securing the Construction Loan and the Line of Credit. **(Not Stipulated)**

17.    The SCC loans were short term (one year) loans with a limited right to briefly extend them upon payment of an extension fee. **(Not Stipulated)**

18.    On May 3, 2017, the original maturity date, the loans were extended for six months in accordance with the loan documents' terms. **(Stipulated)**

19.    Each of the Agreements referenced above were dated and effective as of May 3, 2016. **(Not Stipulated)**

20.    Each of the above-referenced agreements was signed by Andrew Fonfa in his capacity as Manager of Eastern Investments, LLC, the Manager of LVEIRC, the general partner of Lucky Dragon, L.P. **(Stipulated)**

21.    As of May 3, 2016, the execution and effective date of the loan agreements referenced above, and of the Guaranty described below, the Lucky Dragon Hotel and Casino was under construction, and neither the casino nor the hotel were operational.  The Grand Opening was seven months away. **(Not Stipulated)**

22.    A true and correct copy of the Construction Loan Agreement is designated as Plaintiff's Exhibit 11 in SCC's Trial Exhibits list. **(Stipulated)**

23.    A true and correct copy of the Construction Loan Promissory Note is designated as Plaintiff's Exhibit 13 in SCC's Trial Exhibits list. **(Stipulated)**

24.    A true and correct copy of the Line of the Credit Promissory Note is designated as Plaintiff's Exhibit 12 in SCC's Trial Exhibits list. **(Stipulated)**

25.    A true and correct copy of the Line of the Construction Deed of Trust (With Assignment of Leases and Rents, Security Agreement and Fixture Filing) is designated as Plaintiff's Exhibit 29 in SCC's Trial Exhibits list. **(Stipulated)**

26.     The Borrower, LVEIRC, the Guarantors, and certain entities affiliated with the Guarantors also provided SCC with a detailed legal opinion letter regarding the loan transaction. That opinion letter was written by the law firm of Lewis Roca Rothberger Christie, acting as Nevada counsel to, and acting on behalf of, those persons and entities. **(Not Stipulated)**

27.     A true and correct copy of the Lewis Roca Rothberger Christie opinion letter is designated as Plaintiff's Exhibit 30 in SCC's Trial Exhibits list. **(Not Stipulated)**

28.     SCC fully funded the loans to Lucky Dragon, L.P. in accordance with the terms of the above-referenced loan documents. **(Not Stipulated)**

29.     SCC has fully performed its obligations under the above-referenced loan documents. **(Not Stipulated)**

**3.  THE GUARANTY.**

30.     On May 3, 2016, each of the Guarantors also individually executed a Recourse Obligations Guaranty (the "Guaranty").  That Guaranty became effective on that date. **(Not Stipulated)**

31.     The Guaranty is governed by and must be construed in accordance with Nevada law and the applicable laws of the United States of America. *See* Guaranty §5.3. **(Not Stipulated)**

32.     A true and correct copy of the Guaranty is designated as Plaintiff's Exhibit 14 in SCC's Trial Exhibits list. **(Stipulated)**

33.     The Guarantors executed that Guaranty for the benefit of Snow Covered Capital LLC ("SCC") and as an inducement to SCC to make the Loans to Lucky Dragon, L.P. *See* Guaranty Introduction. **(Not Stipulated)**

34.     SCC was not willing to make the loans to Lucky Dragon, L.P. unless the Guarantors unconditionally guaranteed payment and performance to SCC of the Guaranteed Obligations, as defined on page 1 of the Guaranty. **(Not Stipulated)**

35.     Accordingly, each Guarantor irrevocably and unconditionally guaranteed to SCC the payment and performance of the Guaranteed Obligations, as defined in the Guaranty, as and

when the same shall be due and payable *See* Guaranty §1.1  and further agreed, in Section 1.3 of the Guaranty, as follows:

> **1.3**     Nature of Guaranty**.**  This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.  This Guaranty may not be revoked by any Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by any Guarantor and after (if Guarantor is a natural person) such Guarantor's death (in which event this Guaranty shall be binding upon such Guarantor's estate and such Guarantor's legal representatives and heirs).  The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantors to Lender with respect to the Guaranteed Obligations.  This Guaranty may be enforced by Lender and any subsequent holder of the Notes and shall not be discharged by the assignment or negotiation of all or part of the Notes.  **(Not Stipulated)**

36.     The Guaranteed Obligations were defined in Section 1.2 of the Guaranty, as follows:

> **1.2**     Definition of Guaranteed Obligations.   As used herein, the term "Guaranteed Obligations" means the obligations or liabilities of Borrower or Guarantors to Lender for any Losses incurred by Lender arising out of or in connection with the following:
>
> (a)     fraud, material misrepresentation, or willful misconduct by Borrower or any of its partners, officers, principals, or members, or any Guarantor in connection with the Loans;
>
> > physical waste committed on the Premises or damage to the Premises, in each case as a result of the intentional misconduct or gross negligence of Borrower or any of its principals, executive officers, general partners or member; or the removal of any portion of the Premises in violation of the terms of the Loan Documents while an event of default exists;
>
> (b)     subject to any right to contest such matters, as provided in the Deed of Trust, failure to pay any valid taxes, assessments and impositions on the Premises (collectively, the "Taxes")  (except to the extent, but only the extent, the entire amount of the unpaid Taxes has been paid by Borrower pursuant to the Loan Agreement), mechanic's liens, materialmen's liens or other liens on any portion of the Premises which would be superior to the lien or security interest of the Deed of Trust or the other Loan Documents, to the full extent of the amount claimed by any such lien claimant;
>
> > all legal costs and expenses (including reasonable attorneys' fees) reasonably incurred by Lender (i) in connection with litigation or other legal proceedings involving the collection or enforcement of this Guaranty, and (ii) arising from or relating to the filing of a petition under any bankruptcy, reorganization, insolvency, readjustment of debt, rearrangement, dissolution, liquidation or

other similar debtor relief law or statute by or against Borrower or any Guarantor;

(c)    the breach of any representation, warranty, covenant or indemnification provision in that certain Environmental Indemnity Agreement of even date herewith given by Borrower to Lender or in the Deed of Trust concerning environmental laws, hazardous substances or asbestos;

the misapplication or conversion by Borrower of (i) any insurance proceeds paid by reason of any loss, damage or destruction to the Premises, (ii) any awards or other amounts received in connection with the condemnation of all or a portion of the Premises, or (iii) any Rents while an event of default exists; and

(d)    Borrower's failure to maintain any one or more of the insurance policies required under the Loan Agreement (as such requirements may be modified from time to time by Borrower and Lender in accordance with the Loan Agreement) or to pay or provide the amount of any one or more insurance deductible in excess of $25,000.00 following a casualty or other insured event or claim.

The term "Losses" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, demands, causes of action, damages, actual out-of-pocket losses, fines, penalties, charges, fees, actual out-of-pocket costs and expenses (including without limitation reasonable attorneys' fees and expenses), judgments, awards and amounts paid in settlement of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense).

Notwithstanding anything to the contrary in the Notes or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Secured Obligations secured by the Deed of Trust or to require that all collateral shall continue to secure all of the Secured Obligations owing to Lender in accordance with the Loan Documents, and (B) Guarantors shall be liable jointly and severally for the full amount of the Secured Obligations in the event that:  (i) the Premises or any part thereof becomes an asset in a voluntary bankruptcy or voluntary insolvency proceeding under the U.S. Bankruptcy Code, or in an involuntary bankruptcy or involuntary insolvency proceeding brought by any Guarantor or an affiliate of Borrower or Guarantors, or in an involuntary bankruptcy or involuntary insolvency proceeding in which Borrower, any Guarantor or an affiliate of Borrower or any Guarantor has assisted, colluded with or conspired with the Person bringing such action; (ii) Borrower fails to obtain Lender's prior written consent to any voluntary assignment, transfer, or conveyance of fee title to the Premises or any portion thereof or any other voluntary assignment, transfer, or conveyance in violation of the applicable terms and provisions of the Loan Documents; (iii) Borrower fails to obtain Lender's prior written consent to any voluntary assignment, transfer, or conveyance of any ownership interests in Borrower in violation of the applicable

terms and provisions of the Loan Documents; or (iv) Borrower fails to comply with the representations and covenants pertaining to its status as a single purpose entity as set forth in the Loan Agreement. **(Not Stipulated)**

37.     *Provisions Limiting Guarantors' Ability To Reduce Or Discharge Their Liability To SCC Other Than By Performance.* It being the intention of Borrower and Guarantors that Guarantor's obligations hereunder shall not be discharged except by Guarantors' performance of such obligations and then only to the extent of such performance, *see* Guaranty §1.9, in Article II of the Guaranty ("Events and Circumstances Not Reducing or Discharging Guarantors' Obligations"), each Guarantor consented and agreed to each of the following, and agrees that each such Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which such Guarantor might otherwise have as a result of or in connection with any of the following:  (emphasis added).  *See* Guaranty Article II Preamble.

Modifications.   Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Secured Obligations, the Notes, the Deed of Trust, the other Loan Documents, or any other document, instrument, contract or understanding between Borrower and Lender, or any other parties, pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantors of any such action.  *See* Guaranty §2.1.

Adjustment.  Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any other guarantor of the Loans (or any portion thereof).  *See* Guaranty §2.2.

Condition of Borrower or Guarantors.  The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantors or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any sale, lease or transfer of any or all of the assets of Borrower or Guarantors, or any changes in the shareholders, partners or members of Borrower or Guarantors; or any reorganization of Borrower or Guarantors.  *See* Guaranty §2.3.

Invalidity of Guaranteed Obligations.  The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations, or any document or agreement executed in connection with the Guaranteed Obligations, for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations, or any part thereof, exceeds the amount permitted by law, (ii) the act of creating the Guaranteed

Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Notes, the Deed of Trust or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations, or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Notes, the Deed of Trust or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other Person be found not liable on the Guaranteed Obligations or any part thereof for any reason. *See* Guaranty §2.4; *see also* Guaranty §5.4.

Release of Obligors. Any full or partial release of the liability of Borrower on the Guaranteed Obligations, or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by each Guarantor that each such Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and such Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations. *See* Guaranty §2.5.

Other Collateral. The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations. *See* Guaranty §2.6.

Release of Collateral. Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations. *See* Guaranty §2.7.

Care and Diligence. The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or

agreement evidencing or securing all or any part of the Guaranteed Obligations. *See* Guaranty §2.8.

Unenforceability.  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.  *See* Guaranty §2.9.

Offset.  The Notes, the Guaranteed Obligations and the liabilities and obligations of the Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.  *See* Guaranty §2.10; *see also* Guaranty §1.4.

Other Actions Taken or Omitted.  Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantors or increases the likelihood that Guarantors will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantors that Guarantors shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or not contemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.  *See* Guaranty §2.13. **(Not Stipulated)**

38.    The Guaranty further protected SCC's interests in and benefit from, the Guaranty by, *e.g.*, the subordination provisions of Article IV and such protections in other contexts as are afforded by the waiver provisions of Section 1.7 and by Sections 1.5. 1.6, and 5.10 below.

**1.7(b). Waivers**. In addition to waiving their rights under Guaranty Section 1.7(a) and Article II of the Guaranty, each Guarantor fully and completely waived, released and relinquished to the fullest extent permitted (i) by Nevada Revised Statutes ("NRS") Section 40.495(2), the rights, benefits and provisions of the one-action rule under NRS Section 40.430, (ii) by NRS Section 104.3605, the right to discharge under NRS Section 104.3605(9), and (iii) by applicable law, the benefits of NRS 40.495(4).  *See* Guaranty §1.7.

**1.5     Payment By Guarantors.** If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise,

14

Guarantors shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.  Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations, and may be made from time to time with respect to the same or different items of Guaranteed Obligations.  Such demand shall be deemed made, given and received in accordance with the notice provisions hereof. *See* Guaranty §1.5.

**No Duty To Pursue Others.** It shall not be necessary for Lender (and each Guarantor hereby waives any rights which such Guarantor may have to require Lender), in order to enforce the obligations of Guarantors hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loans or the Guaranteed Obligations or any other Person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantor(s) of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations.  Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations. *See* Guaranty §1.6.

**5.10**    Rights and Remedies**.** If any Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantors.  The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy. *See* Guaranty §5.10. (**Not Stipulated**)

39.    Guarantors Representations and Warranties.  To induce SCC to enter into the Loan Documents and extend credit to Borrower, Guarantors also represented and warranted to SCC as follows:

Each Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Notes or Guaranteed Obligations; however, Guarantors are not relying on such financial condition or the collateral as an inducement to enter into this Guaranty. *See* Guaranty §3.2.

Neither Lender nor any other party has made any representation, warranty or statement to Guarantors in order to induce the Guarantors to execute this Guaranty. *See* Guaranty §3.3.

15

As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, each Guarantor is, and will be, solvent, and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities. *See* Guaranty §3.4.

The execution, delivery and performance by Guarantors of this Guaranty and the consummation of the transactions contemplated hereunder do not, and will not, contravene or conflict with any law, statute or regulation whatsoever to which Guarantors are subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, deed of trust, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor. This Guaranty is a legal and binding obligation of Guarantors and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights. *See* Guaranty §3.5.

That either (A) any Guarantor's spouse is not required to join in and acknowledge and consent to this Guaranty in order for Lender to make a claim on all of the interests in all of the assets shown on the financial statements of such Guarantor last delivered to Lender on or prior to the date of this Guaranty or (B) all of such assets are such Guarantor's sole and separate property and none of such assets constitute any portion of such Guarantor's joint, community, marital or mixed property, or (ii) if neither clause (A) or (B) immediately preceding are true, then such Guarantor's spouse has executed this Guaranty for the express purpose of acknowledging and consenting to the same so as to allow the Lender to realize upon such spouse's joint, community, marital or mixed property interest, if any, in all of such assets to satisfy such Guarantor's obligations pursuant to this Guaranty. *See* Guaranty §3.6.

**EACH AND ALL OF THE REPRESENTATIONS, COVENANTS, AGREEMENTS, AND INDEMNITIES MADE OR GIVEN BY GUARANTOR IN THIS GUARANTY SHALL SURVIVE THE PAYMENT IN FULL OF THE SECURED OBLIGATIONS, A PROPERTY TRANSFER PERMITTED BY THE DEED OF TRUST, THE TERMINATION OR RELEASE OF THIS GUARANTY BY LENDER, AND THE EXERCISE BY LENDER OF ANY OF ITS RIGHTS OR REMEDIES HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT, INCLUDING, BUT NOT LIMITED TO, THE ACQUISITION OF THE PREMISES BY FORECLOSURE OR CONVEYANCE IN LIEU OF FORECLOSURE, BUT ONLY TO THE EXTENT OF ACTS OR EVENTS OCCURRING, OR OBLIGATIONS (INCLUDING INDEMNIFICATION OBLIGATIONS) FIRST ARISING (AS OPPOSED TO FIRST DISCOVERED) PRIOR TO SUCH PAYMENT IN FULL, PERMITTED PROPERTY TRANSFER, THE TERMINATION OR RELEASE OF THIS GUARANTY BY LENDER, OR THE ACQUISITION OF THE PREMISES BY FORECLOSURE OR**

**CONVEYANCE IN LIEU OF FORECLOSURE.**  *See* Guaranty §3.7 (emphasis in original). **(Not Stipulated)**

40.    Guarantor Liability.    The Guaranty emphasizes in numerous places that the Guarantors are jointly and severally liable for the Guaranteed Obligations.  *E.g,*

- In Section 1.1 the Guarantors agreed that "[e]ach Guarantor hereby irrevocably and unconditionally covenants and agrees that each Guarantor is liable for the Guaranteed Obligations as a primary obligor."

- In Section 5.6 ("Parties Bound; Assignment; Joint and Several"), the Guarantors agreed that "[t]his Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantors may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder.   If Guarantors consists of more than one Person, the obligations and liabilities of each such Person shall be joint and several.

- In Section 4.5 the Guarantors further agreed that "[a] All obligations under this Guaranty are joint and several and shall be binding upon each Guarantor and a default by any such Guarantor shall be deemed a default by all Guarantors. Notwithstanding any provisions of this Guaranty to the contrary, it is intended that the joint and several nature of the liability of the Guaranteed Obligations and the liens and security interests, if any, granted as security for the Guaranteed Obligations, not constitute a fraudulent conveyance under the Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the applicable provisions of any fraudulent conveyance or fraudulent transfer law or similar law of any state, nation or other governmental unit, as in effect from time to time (a "**Fraudulent Conveyance**").   Consequently, if the liability of any Guarantor for Guaranteed Obligations, or any liens or security interests granted by Guarantor securing Guaranteed Obligations would, but for the application of this sentence, constitute

a Fraudulent Conveyance, the liability of any Guarantor and the liens 18ecurety interests securing such liability shall be valid and enforceable only to the maximum extent that would not cause such liability or such lien or security interest to constitute a Fraudulent Conveyance.  Subject to the foregoing, to the extent that any Guarantor shall, under this Guaranty or the Loan Agreement as a joint and several obligor, repay any of the Guaranteed Obligations constituting Loans or other advances made to another Person under the Credit Agreement (an "**Accommodation Payment**"), then the Guarantor making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Guarantors in an amount equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Guarantor's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Guarantors.  As of any date of determination, the "**Allocable Amount**" of each Guarantor shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Guarantor hereunder and under the Loan Agreement without (a) rendering such Guarantor "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code of the United States, Section 2 of the Uniform Fraudulent Transfer Act ("**UFTA**") or Section 2 of the Uniform Fraudulent Conveyance Act ("**UFCA**"), (b) leaving such Guarantor with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code of the United States, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Guarantor unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code of the United States or Section 4 of the UFTA, or Section 5 of the UFCA.

**(Not Stipulated)**

41.    Section 1.8 of the Guaranty also provided that, in the event that Guarantors should breach or fail to timely perform any provisions of this Guaranty, Guarantors shall, immediately

upon demand by [SCC], pay [SCC] all costs and expenses (including court costs and reasonable attorneys' fees) incurred by [SCC] in the enforcement hereof or the preservation of [SCC's] rights hereunder.  Section 1.8 further provided that "[t]he covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations. **(Not Stipulated)**

42.    The Guaranty Remains Unchanged.   Section 5.12 of the Guaranty sets forth a comprehensive entire agreement clause as follows (bold capital letters in original):

> **5.12 Entirety.   THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTORS AND LENDER WITH RESPECT TO GUARANTORS' GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF.    THIS GUARANTY IS INTENDED BY GUARANTORS AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTORS AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT.    THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTORS AND LENDER. (Not Stipulated)**

43.    The anti-waiver provision of Section 5.1 of the Guaranty provides that "[n]o failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right.  The rights of SCC hereunder shall be in addition to all other rights provided by law.  No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand." *See* Guaranty §5.1. **(Not Stipulated)**

44.     Section 5.5 of the Guaranty also provided that the Guaranty could be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.  The Guaranty has never been amended, or waived in any respect, and the parties have never executed an instrument in writing of the type described in Sections 5.1 and 5.5 of the Guaranty. **(Not Stipulated)**

**4.   THE LIFE AND DEATH OF THE LUCKY DRAGON.**

45.     The Lucky Dragon Hotel & Casino held its Grand Opening on December 3, 2016. **(Stipulated)**

46.     On or about January 4, 2018, the Lucky Dragon Casino was closed. **(Stipulated)**

47.     LVEIRC and the Guarantors made the decision to close the Casino**.**  The Lucky Dragon Hotel was closed on October 8, 2018. **(Stipulated)**

48.     LVEIRC and the Guarantors made the decision to close the Hotel, with the Bankruptcy Court permission that was then required. **(Not Stipulated)**

49.     The Lucky Dragon Hotel & Casino was unprofitable from inception. **(Stipulated)**

50.     By August 3, 2017, LD LP had breached the loan documents by failing to make a monthly interest payment required under the loan documents.  On August 8, 2017, SCC notified LD LP and the Guarantors of LD LP's default under the Construction Loan and warned that a failure to cure would result in foreclosure proceedings under the Deed of Trust. **(Not Stipulated)**

51.     On August 18, 2017, SCC sent LD LP and each of the Guarantor Defendants the written statement required by NRS 107.08 and 107.095 setting forth the default and the steps necessary to cure.On September 1, 2017, First American Title Insurance Company, the Substitute Trustee, recorded a Notice of Default and Election to Sell Under Deed of Trust with the Clark County Recorder's Office and sent copies of that notice to LD LP and the Guarantors.  November 3, 2017 was the extended maturity date under the loan documents.  That date passed without LD LP making any of the payments due at the maturity date.  On January 9, 2018, First American Title Insurance Company, the Substitute Trustee recorded a Notice of Trustee's Sale with the Clark County Recorder's Office and then: (1) sent copies to LD LP and the Guarantor Defendants; and

(2) published the Notice of Sale as required by the applicable statutes. The date initially specified for the Trustee's Sale was February 6, 2018, but SCC subsequently postponed it, from time to time, with the last postponement beingto June 15, 2018. (**Not Stipulated**)

52.     On February 16, 2018, Lucky Dragon Hotel & Casino, LLC, a sister company to LD LP managed by LVEIRC, filed a voluntary petition for a Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Nevada. Immediately after filing for bankruptcy, LD LLC filed a motion to extend the automatic stay to prohibit SCC from concluding its foreclosure on the Property. SCC believes Guarantors orchestrated this motion in order to stay SCC's pending foreclosure proceedings against the Property in a manner that would allow them to argue they did not trigger liability to SCC by placing LD LP into bankruptcy. This motion was ultimately withdrawn. Immediately after filing for bankruptcy, LD LLC also filed a motion to use cash collateral that contained a request for a surcharge against SCC in an effort to shift the cost of LD LLC's bankruptcy to SCC. SCC opposed this request. LVEIRC, as the manager of the Lucky Dragon Hotel & Casino, LLC, made the decision to file that company's bankruptcy. (**Not Stipulated**)

53.     The Voluntary Petition that initiated the Lucky Dragon Hotel & Casino LLC bankruptcy was signed by Andrew Fonfa, as the Managing Member of Eastern Investments, LLC, one of LVEIRC's co-owners and co-managers. On February 21, 2018, LD LP filed a voluntary petition for a Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Nevada. The LD LP bankruptcy proceeding stayed SCC's pending foreclosure proceeding against the Property. LVEIRC, as the general partner of LD LP made the decision to file that company's bankruptcy. (**Not Stipulated**)

54.     The Voluntary Petition that initiated the LD LP Bankruptcy was signed by Andrew Fonfa, as the Managing Member of Eastern Investments, LLC, one of LVEIRC's co-owners and co-managers. Guarantors made the decision, on behalf of LD LLC and LD LP to engage Samuel Schwartz as bankruptcy counsel for both LD LLC and LD LP. The Lucky Dragon Hotel & Casino

property was the only significant asset of the LD LP bankruptcy estate. The LD LLC bankruptcy estate had no ownership interest in that Property. **(Not Stipulated)**

55.    Because neither the LD LP nor the LD LLC bankruptcy estates had any liquid assets, much of these jointly administered bankruptcy proceedings was devoted to efforts by Mr. Schwartz, acting under LVEIRC's direction, to make SCC pay the cost of the bankruptcies, which efforts were uniformly resisted by SCC. LVEIRC had declined to pay the cost of the bankruptcies. On March 2, 2018, SCC sent a demand letter to the Guarantors pointing out that they had violated the Guaranty and demanding that they honor the terms of that Guaranty, and *e.g.,* pay the back property taxes, SCC's legal fees, and the outstanding debt, as required by the Guaranty. [The Guarantors refused to make any of the required payments referenced in SCC's March 2, 2018 demand letter. **(Not Stipulated)**

56.    Prior to the LD LP bankruptcy, LD LP had engaged Robert Heller and Spectrum Gaming Capitalto obtain new financing or sell the Lucky Dragon Hotel & Casino Property (the "Property"). **(Not Stipulated)**

57.    Mr. Heller and Spectrum extensively advertised and marketed the Property to all known potential buyers. **(Not Stipulated)**

58.    During this same period LD LP, as the owner of the Property, was the only entity with authority to sell the Property. **(Not Stipulated)**

59.    SCC had no authority to sell the Property in the period before the LD LP bankruptcy. **(Not Stipulated)**

60.    From the time of his engagement to the time of the filing of the LD LP bankruptcy, Mr. Heller was unable to obtain the new financing or sell the Property on terms that LD LP was willing to accept. **(Not Stipulated)**

61.    After the LD LP bankruptcy filing, LD LP engaged Matt Sodl and Innovation Capital to sell the Lucky Dragon Hotel & Casino Property. **(Stipulated)**

62.    Mr. Sodl extensively advertised and marketed the Property to all known potential buyers. **(Not Stipulated)**

63. For most of the bankruptcy, LD LP, as the owner of the Property, was still the only entity with authority to sell the Property, but could only do so with Bankruptcy Court approval. **(Not Stipulated)**

64. Though Mr. Sodl wished to sell the Property "free and clear" through a 363 sale process, Sam Schwartz, as counsel for the Lucky Dragon debtors resisted that process, preferring to effect the sale through a plan of reorganization that would give him and the Debtors, not SCC, control over the terms of the sale and the distribution of the sale proceeds. SCC had no authority to sell the Property in the period from the date of the LD LP bankruptcy filing until after SCC purchased the Property in the October 30, 2018 foreclosure sale. **(Not Stipulated)**

65. From the time of his engagement to the time of the filing of the LD LP bankruptcy, Mr. Sodl was unable to sell the Property on terms that LD LP was willing to accept, turn into a binding contract, or submit for Bankruptcy Court approval. **(Not Stipulated)**

66. On September 10, 2018, LD LP conducted a public Bankruptcy Court-approved auction of the Property. **(Stipulated)**

67. The highest bid at that auction was SCC's credit bid of $35 million. **(Stipulated)**

68. The next highest bid at the auction was Transworld's $33.75 million, not all of which would have gone to SCC. **(Not Stipulated)**

69. None of the Guarantors chose to bid on the Property at the auction. **(Not Stipulated)**

70. The auction was intended to finance an LD LP plan of reorganization. Without higher bids, that plan of reorganization failed. **(Stipulated)**

**5.   THE OCTOBER 30, 2018 FORECLOSURE SALE AND ITS AFTERMATH.**

71. In the wake of the failed auction, on September 25, 2018, the Bankruptcy Court entered an order granting SCC's motion for relief from the automatic stay. That order allowed SCC to exercise its rights, as the secured creditor, to foreclose on the Property. **(Not Stipulated)**

72.     On September 28, 2018, the Substituted Trustee under the Deed of Trust recorded a Notice of Trustee's Sale with the Clark County Recorder's Office and sent copies to LD LP and the Guarantors. **(Not Stipulated)**

73.     At its own expense, SCC retained CBRE's Global Gaming Group to advertise and market the Property prior to the foreclosure sale, in the hope of drumming up interest in the coming Trustee's Sale. **(Not Stipulated)**

74.     A publicly accessible, properly noticed Trustee's sale was conducted on October 30, 2018. **(Not Stipulated)**

75.     By the time the October 30, 2018 Trustee Sale closed:

- Lucky Dragon LLP had been in bankruptcy since February 21, 2018;
- The casino had been closed since January 4, 2018;
- The hotel had been closed since October 8, 2018;
- Restaurants and other facilities at the Lucky Dragon had been closed throughout 2018;
- The Property was shuttered and ringed with security fence;
- Mr. Heller and Spectrum Gaming had been unable to sell the Property for more than $36 million;
- Mr. Sodl and Innovation Capital had been unable to sell the Property for more than $36 million;
- The bankruptcy auction had failed to produce an offer higher than $35 million;
- The worldwide universe of potential hotel/casino buyers had been solicited multiple times; and
- The Trustee's Sale drew no bids from any potential buyer willing to pay more than SCC's $35 million. **(Not Stipulated)**

76.     The only bid at the Trustee's Sale was SCC's $35 million credit bid. **(Not Stipulated)**

77.     None of the potential purchasers that investigated the Property before or during the bankruptcy proceedings chose to bid on the Property at the Trustee's Sale. **(Not Stipulated)**

78.    None of the Guarantors chose to bid on the Property at the Trustee's Sale. **(Not Stipulated)**

79.    SCC's purchase of the Property at the Trustee's Sale created the first opportunity for SCC itself to sell the Property. **(Not Stipulated)**

80.    Following the Trustee's Sale, SCC engaged CBRE's Global Gaming Group to aggressively market the Property. **(Not Stipulated)**

81.    Following the Trustee's Sale, Guarantor Defendant Fonfa engaged in numerous fraudulent transfers to family members and others intended to transfer and hide assets from SCC and hinder any SCC collection of a judgment against Fonfa. **(Not Stipulated)**

82.    Those Fonfa transfers violated the terms of the Guaranty and made all of the Guarantors liable for any losses occasioned by those transfers effected in violation of the Guaranty. **(Not Stipulated)**

83.    At the present time, SCC does not know if Defendants Weidner and Jacoby have engaged in similar efforts to hide assets and frustrate SCC collection activity. **(Not Stipulated)**

84.    After a worldwide marketing effort, CBRE was able to arrange the April 22, 2019 sale of the Property to a company owned by Las Vegas' Don Ahern - 300 West Sahara LLC - for $36 million. **(Not Stipulated)**

85.    The net to SCC from the Ahern sale was far less than $36 million. **(Not Stipulated)**

86.    By the time of the Ahern sale, and since, the Guarantors have still not honored any of the terms of the Guaranty. **(Not Stipulated)**

87.    By the time of the Ahern Sale, and since, the Guarantors have not paid SCC on any of their obligations under the Guaranty. **(Not Stipulated)**

88.    The above-captioned lawsuit resulted from the Guarantor's refusals to honor any of their obligations under the Guaranty. **(Not Stipulated)**

**B.    DEFENDANTS' VIEW.**

*The SCC Loan to the Lucky Dragon, LP*

1.    Defendant Lucky Dragon, LP ("*LD LP*") is a Nevada limited partnership.

(**Stipulated**).

2.      SCC is a single purpose California limited liability Company which was funded entirely by Griffith Harsh V, its owner and ultimate authority/decision-maker.  This was Mr. Harsh's first foray as a lender.  (**Not Stipulated**).

3.      Enrique Landa was the manager of SCC and met with Mr. Harsh on a daily basis regarding SCC business, but Mr. Harsh had the final say-so on all decisions since it was Mr. Harsh's capital.  (**Stipulated**).

4.      On or about May 3, 2016, SCC entered into a series of agreements (collectively the "***Loan Documents***") to provide loans to LD LP for the construction of a new hotel and casino in Las Vegas, Nevada to be called the Lucky Dragon (the "***Lucky Dragon***").  These agreements included:

- A "Construction Loan" between SCC and LD LP;
- A Secured Promissory Note (Construction Loan) given by LD LP and payable to SCC in the amount of $30,000,000 and a Secured Promissory Note (Line of Credit) given by LD LP and payable to SCC in the amount of $15,000,000 (collectively the "***Notes***");
- A Construction Deed of Trust (with assignment of leases and rents, security agreement and fixture filings) (the "***Deed of Trust***") executed by LD LP for the benefit of SCC;
- A Completion Guaranty Agreement (the "***Completion Guaranty***") signed by Defendants William Weidner, Andrew Fonfa and David Jacoby;
- A Recourse Obligations Guaranty (the "***Recourse Guaranty***") signed by Defendants William Weidner, Andrew Fonfa, and David Jacoby; and
- A First Amendment to Construction Loan Agreement and Extension Agreement, which extended the maturity date for the repayment of the amounts borrowed from SCC.  The maturity date was extended to November 3, 2017.  (**Not Stipulated**).

1

*The Construction of the Lucky Dragon Hotel and Casino*

2      5.      SCC conducted a thorough due diligence before entering into the Loan Documents

3   including its own cash flow projections showing SCC would be repaid after the first year.  (**Not**

4   **Stipulated**).

5      6.      Through its due diligence, SCC satisfied itself that the Lucky Dragon was a viable

6   project and that the risks in making this loan were acceptable.  (**Not Stipulated**).

7      7.      Neither Mr. Harsh nor Mr. Landa had prior experience with casino transactions.

8   (**Not Stipulated**).

9      8.      LD LP intended to recapitalize the Lucky Dragon project shortly after opening to

10  replace the Notes.  (**Not Stipulated**).

11     9.      LD LP obtained approximately $90,000,000 in investments from EB-5 investors

12  who became limited partners in LD LP (the "***EB-5 Investors***").  (**Not Stipulated**).

13     10.     At the relevant time, under the EB-5 program, 8 U.S.C. § 203(b)(5), foreign

14  nationals who invested $500,000 into a targeted employment area that created at least 10

15  qualifying jobs (and met other criteria) were eligible to receive Green Cards so long as their

16  investment was "at risk."  *See* 8 C.F.R. § 204.6; USCIS Policy Manual, Vol. 6, Part G, Ch. 4; Final

17  Rule, 84 Fed. Reg. 35750, 35752 (July 24, 2019).  (**Not Stipulated**).

18     11.     Neither Mr. Harsh nor Mr. Landa had prior experience with EB-5 transactions.

19  (**Not Stipulated**).

20     12.     The Lucky Dragon was built in 2016 at a cost of more than $160,000,000.00.  The

21  Lucky Dragon was a well-constructed building and was built in accordance with the plans that

22  were provided to SCC.  (**Stipulated**).

23     13.     The Lucky Dragon was located along the north side of Sahara Avenue, between

24  Fairfield Avenue and Tam Drive, in close proximity to Las Vegas Boulevard.  (**Not Stipulated**).

25     14.     The real estate and improvements (the "***Property***") were owned by LD LP.  (**Not**

26  **Stipulated**).

27     15.     Lucky Dragon, LLC ("***LD LLC***") operated the hotel and casino.  (**Not Stipulated**).

28

16.    The Lucky Dragon included a 222,548-square-foot, 203-room hotel, 27,500-square-foot casino and 408 parking spaces on 2.51 acres of land.  (**Not Stipulated**).

17.    The Lucky Dragon amenities included a lobby with front desk and reception area, multiple food and beverage outlets, casino space, retail areas, a business center, spa, outdoor swimming pool, guest pantry/gift shop, guest laundry, attached parking garage and wireless high-speed internet.  (**Not Stipulated**).

18.    The Lucky Dragon was designed to cater to Asian gamblers.  (**Not Stipulated**).

### *The Lucky Dragon's Struggles and Retention of Robert Heller*

19.    The Lucky Dragon opened on November 19, 2016. (**Stipulated**).

20.    The Lucky Dragon's profitability struggled after it opened due to a less than normalized "hold" percentage in the casino.  (**Not Stipulated**).

21.    LD LP retained Robert Heller and Spectrum Gaming Capital in or about March 2017. (**Stipulated**).

22.    Mr. Heller is the CEO of Spectrum Gaming Capital ("*Spectrum*"). (**Stipulated**).

23.    Mr. Heller was initially retained to assist in finding financing to take out SCC.  (**Not Stipulated**).

24.    By May 11, 2017, Mr. Heller received three term sheets from reputable lenders, each for loans in the amount of $60,000,000.  (**Not Stipulated**).

25.    However, as discussions continued with many potential investors, the Lucky Dragon hold percentage continued to be depressed, resulting in operating losses.  (**Not Stipulated**).

26.    In May 2017, Mr. Heller recommended that the refinancing process be curtailed until the Lucky Dragon could show at least one month of normalized hold and operating profit. (**Not Stipulated**).

27.    In late spring or early summer of 2017, SCC was approached with offers to buy its Notes.  (**Not Stipulated**).

28.    Spectrum's retention was changed in July 2017 to sell the general partner interest in

LD LP and the LD LLC.  (**Not Stipulated**).

29.     Mr. Heller sent a Confidential Information Memorandum to all potential buyers in July 2017 (the "***July 2017 CIM***").  (**Not Stipulated**).

30.     The July 2017 CIM advised potential buyers that the sale was of the general partner interest in the LD LP and the LD LLC.  (**Not Stipulated**).

31.     The July 2017 CIM advised potential buyers that the buyer would need to "fund in cash the repayment of" SCC.  (**Not Stipulated**).

32.     The July 2017 CIM advised potential buyers the buyer would "retain an obligation that can repay the EB-5 investors . . . ."  (**Not Stipulated**).

33.     The July 2017 CIM advised potential buyers that the EB-5 Investors needed to maintain their interest in LD LP after the sale. (**Not Stipulated**).

34.     The July 2017 CIM advised potential buyers that, as of the second quarter of 2017, LD LP had liabilities totaling approximately $58,600,000.  (**Not Stipulated**).

35.     The July 2017 CIM advised potential buyers that the EB-5 Investors had equity of $90,000,000 in LD LP.  (**Not Stipulated**).

36.     Therefore, pursuant to the July 2017 CIM, a buyer would be acquiring an interest in the Lucky Dragon LP – and not even the entire Lucky Dragon LP since the remaining limited partnership interests would be retained by EB-5 Investors – which at the time was subject to the assumption of approximately $58,600,000 in liabilities including current liabilities, the SCC loan, and various FF&E and other payables.  (**Not Stipulated**).

37.     Further, there would have been no income to pay these liabilities if the Lucky Dragon needed to be closed during its repositioning by a buyer.  (**Not Stipulated**).

38.     The July 2017 CIM advised potential buyers that "(d)espite strong growth in daily drop, hold percentage is well below 15% normalized level."  (**Not Stipulated**).

39.     By about August 3, 2017, there were two offers that were being heavily considered, one from Fortress Investment Group ("***Fortress***") and one from Yaping Wang.  (**Not Stipulated**).

40.     On or about September 12, 2017, a "binding term sheet" was signed by

representatives of Yaping Wang.  (**Not Stipulated**).

41.     Fortress disengaged from discussions. (**Not Stipulated**).

42.     However, the contemplated transaction with Yaping Wang failed to move forward. (**Not Stipulated**).

43.     While the Lucky Dragon struggled financially, entities affiliated with certain of the Guarantors infused additional funds to keep the Property operating throughout 2017, with the majority of those funds (over $18 million) being provided by entities affiliated with Weidner. (**Not Stipulated**).

44.     Mr. Heller sent a Confidential Information Memorandum to potential buyers in December 2017 (the "***December 2017 CIM***"). (**Not Stipulated**).

45.     The December 2017 CIM advised potential buyers that the sale was of the general partner interest in the LD LP and the LD LLC.  (**Not Stipulated**).

46.     The December 2017 CIM advised potential buyers that the buyer would need to fund the repayment of SCC. (**Not Stipulated**).

47.     The December 2017 CIM advised potential buyers the buyer would "retain an obligation that can repay the EB-5 investors . . . ." (**Not Stipulated**).

48.     The December 2017 CIM advised potential buyers that the EB-5 Investors needed to maintain their interest in LD LP after the sale. (**Not Stipulated**).

49.     The December 2017 CIM advised potential buyers that, as of the second quarter of 2017, LD LP had liabilities totaling approximately $58,600,000.  (**Not Stipulated**).

50.     The December 2017 CIM advised potential buyers EB-5 Investors had equity of $90,000,000 in LD LP.  (**Not Stipulated**).

51.     Therefore, pursuant to the December 2017 CIM, a buyer would be acquiring an interest in the Lucky Dragon LP – and not even the entire Lucky Dragon LP since the remaining limited partnership interests would be retained by EB-5 Investors – which at the time was subject to the assumption of approximately $58,600,000 in liabilities including current liabilities, the SCC loan, and various FF&E and other payables. (**Not Stipulated**).

52.     There would have been no income to pay these liabilities if the property needed to be closed during its repositioning by a buyer. (**Not Stipulated**).

53.     The December 2017 CIM advised potential buyers that "since opening, the property has not achieved normalized hold percentages." (**Not Stipulated**).

54.     The existence of EB-5 Investors created significant problems in the sales process. (**Not Stipulated**).

55.     Many potential buyers expressed concerns to Mr. Heller regarding the EB-5 Investors. (**Not Stipulated**).

56.     The EB-5 Investors did not have a single representative point of contact with whom to negotiate, which made it more difficult for Mr. Heller and the potential buyers. (**Not Stipulated**).

57.     Therefore, the assets being marketed during this time – e.g., the general partner interest in LD LP – were very different than simply selling the Property "free and clear" of any liabilities or EB-5 issues. (**Not Stipulated**).

*SCC's Notice of Default*

58.     On August 8, 2017, formal notice of default was issued from SCC. (**Stipulated**).

59.     On August 18, 2017, SCC sent a notice of default and demand letter. (**Not Stipulated**).

60.     After the default, SCC was interested in entertaining offers for the purchase of its Notes and was open to inbound offers.  In the summer/fall of 2017, SCC received several offers to buy its Notes. (**Not Stipulated**).

61.     With SCC's full knowledge and consent, CBRE was marketing SCC's Notes for sale.  SCC never directed CBRE to stop marketing the Notes.  To the contrary, SCC informed CBRE that the Notes were available for sale to a qualified buyer.  CBRE therefore actively marketed the Notes for sale in 2017.  (**Not Stipulated**).

62.     SCC's marketing of the Notes created significant confusion in the market. (**Not Stipulated**).

63.    CBRE expected to be paid by SCC if its efforts resulted in a sale of the SCC Notes. (**Not Stipulated**).

64.    On or about September 1, 2017, SCC executed and recorded the Substitution of Trustee with the Clark County Recorder's office as Book/Instrument 20170301-000514, which substituted First American Title Insurance Company in the place of Nevada Title Company. (**Stipulated**).

65.    On September 1, 2017, SCC recorded a Notice of Default and Election to Sell under Deed of Trust, which was recorded in the Clark County Recorder's Office as Book/Instrument No. 20170901-0000515. (**Stipulated**).

66.    Heller's sales process was ongoing when SCC publicly recorded the Notice of Default. (**Not Stipulated**).

67.    In late 2017, SCC considered a number of options in light of the default.  One of those options was a deed in lieu of foreclosure. (**Not Stipulated**).

68.    In connection with its consideration of these other options, SCC sought input from a number of sources.  Among other things, SCC retained Larry Bertsch CPA, who, among other things, advised SCC against accepting a deed in lieu of foreclosure which would release the guarantors from further liability. (**Not Stipulated**).

69.    Accountant Bertsch also reviewed the financial information of Lucky Dragon in 2017 and advised SCC that it would never be profitable.  (**Not Stipulated**).

70.    Accountant Bertsch's recommendations to SCC were a factor in SCC's decision to proceed with a foreclosure of the Lucky Dragon, rather than pursue an alternative option such as a deed in lieu of foreclosure.  (**Not Stipulated**).

71.    Accountant Bertsch was a part of SCC's team in 2017, along with SCC's attorneys and other advisors, and was compensated by SCC for his efforts.  (**Not Stipulated**).

72.    SCC also consulted with and received advice from CBRE which was a factor in SCC's decision to proceed with a foreclosure sale. (**Stipulated**).

73.    CBRE informed SCC that a repositioning of the property was advisable since the

Lucky Dragon model had not worked. (**Not Stipulated**).

74.    CBRE advised SCC that it would be easier to sell the asset after a foreclosure which would eliminate all liens and SCC could sell free and clear title to the Lucky Dragon, including title clear of the claims of the EB-5 Investors. (**Stipulated**).

75.    In obtaining information from Lucky Dragon that SCC wanted to provide to its prospective advisors, consultants and operators, such as Todd Greenberg and Michael Brunet, SCC made misrepresentations to principals of Lucky Dragon as to the actual involvement of such individuals. (**Not Stipulated**).

76.    On January 4, 2018, the casino, bars, and three (3) of the four (4) restaurants were closed. (**Stipulated**).

77.    On January 9, 2018, the Substitute Trustee recorded a Notice of Trustee's Sale with the Clark County Recorder's Office as Book/Instrument No. 20180109-0001520. (**Stipulated**).

78.    SCC's public notice of foreclosure sale was recorded at a time when Heller had identified a number of prospective purchasers and had called for bids therefrom. SCC was aware of Heller's marketing momentum and that several term sheets were anticipated as a result of Heller's efforts.  (**Not Stipulated**).

79.    On January 29, 2018, Mr. Heller sent an email to Lucky Dragon executives stating that there was significant confusion in the market created by SCC's process to market the property, which was overlapping and conflicting with Mr. Heller's marketing. (**Not Stipulated**).

80.    SCC's public efforts to foreclose on the Property further hampered Spectrum's marketing efforts. (**Not Stipulated**).

81.    The SCC trustee's sale was scheduled to take place on February 6, 2018. (**Not Stipulated**).

1   ***The Lucky Dragon Bankruptcy***

2   82.    The LD LP and the LD LLC filed voluntary Chapter 11 bankruptcy in February

3   2018. (**Stipulated**).

4   83.    Mr. Harsh was very angry with the debtors and the Bankruptcy proceedings became

5   extremely contentious.  (**Not Stipulated**).

6   84.    Mr. Harsh's anger was fueled, at least in part, by his concern that "as a relatively

7   new guy in the industry making big investments," this loan was a "black mark" on his record.

8   (**Not Stipulated**).

9   85.    During the bankruptcy proceedings, SCC pushed "full force" to get the property,

10  which included the filing of a number of motions, including a very early motion to lift stay. (**Not

11  Stipulated**).

12  86.    On February 20, 2018, SCC filed in the Bankruptcy Action a Declaration of Keith

13  Harper, MAI ("***Harper Declaration I***") and an appraisal ("***Harper Appraisal I***") prepared by Mr.

14  Harper. (**Not Stipulated**).

15  87.    Harper Declaration I and Harper Appraisal I stated the value of the Property was

16  $60,000,000 as of January 31, 2018. (**Not Stipulated**).

17  88.    On May 22, 2018, SCC submitted a declaration ("***Harper Declaration II***") and

18  appraisal ("***Harper Appraisal II***") prepared by Keith Harper, MAI. (**Not Stipulated**).

19  89.    Harper Declaration II and Harper Appraisal II stated that the value of the Property

20  was $55,500,000 as of May 4, 2018. (**Not Stipulated**).

21  90.    On May 22, 2018, SCC submitted a declaration ("***Hedden Declaration***") and

22  formal appraisal review ("***Hedden Appraisal Review***") prepared by Michael Hedden, MAI, CRE,

23  FICS. (**Not Stipulated**).

24  91.    The Hedden Declaration and Hedden Appraisal Review represented that the Harper

25  Appraisals were correct. (**Not Stipulated**).

26  92.    A hearing was held in the Bankruptcy Court beginning on May 25, 2018 (the

27  "***Hearing***"). (**Not Stipulated**).

28

93.     During the Hearing, SCC represented to the Court that the value of the Property was $55,500,000. (**Not Stipulated**).

94.     The Bankruptcy Court concluded at the end of the Hearing on June 5, 2018, that the "value of the property is between 55.5 million and 60 million based upon the Harper appraisal . . . ."  The debtors did not submit their own appraisal for the Bankruptcy Court to consider at the Hearing. (**Not Stipulated**).

95.     Matthew Sodl and Innovation Capital were retained as part of the Bankruptcy proceeding to sell the LP LD's assets.  (**Not Stipulated**).

96.     In May 2018, Mr. Sodl sent a Confidential Investor Presentation to potential buyers (the "***Bankruptcy CIP***"). (**Stipulated**).

97.     The Bankruptcy CIP told potential buyers that LD LP had "existing debt and other claims with balances:

- Senior secured note payable $48.9 million
- Various trade payables: approximately $3.0 million
- EB-5 Investors: $89.5 million"  (**Not Stipulated**).

98.     The Bankruptcy CIP told potential buyers that the "EB-5 investors need to maintain an ownership role in the Company in order to satisfy their EB-5 mandates." (**Not Stipulated**).

99.     In May 31, 2018, Mr. Sodl sent letters to potential buyers stating:

- "the Debtors intend to file a plan of reorganization which will include either 1) a sale of the Property via §363 in Chapter 11 of the Bankruptcy Code (a "***Sale Transaction***") or 2) a new value plan under which new cash equity is injected into the Debtors estates (a "***New Value Plan Transaction***" and collectively a "***Transaction***").  Innovation Capital LLC ("***Innovation***") has been requested by the Debtors to solicit preliminary non-binding expression of interests (the "***Proposal***") from potential bidders for a Transaction
- . . . Please arrange for your Proposal to be submitted in writing via email no later than 5:00 PM (PDT) on June 14, 2018 . . . ."

35

- Guidelines for any Proposal being submitted. (**Not Stipulated**).

100. On July 17, 2018, emails were sent to potential buyers with the following deadlines:

- August 22, 2018: Due diligence deadline;

- September 3, 2018: Deadline to submit a Qualifying Bid (as defined in the Billing Procedures, which includes a mark-up of the form asset purchase agreement and a $2.5 million deposit); and

- September 10, 2018: Bankruptcy sale hearing and auction. (**Not Stipulated**).

101. The existence of the EB-5 Investors made the Bankruptcy Court sales process more difficult. (**Not Stipulated**).

102. The EB-5 Investors threatened litigation during the Bankruptcy proceeding. (**Not Stipulated**).

103. Potential Buyers were made aware that the EB-5 Investors threatened litigation during the Bankruptcy proceeding. (**Not Stipulated**).

104. The EB-5 Investors were not willing to provide a release to potential buyers in the Bankruptcy proceeding. (**Not Stipulated**).

105. There were different factions of EB-5 Investors which made it harder to negotiate with the EB-5 Investors during the Bankruptcy proceeding. (**Not Stipulated**).

106. The EB-5 Investors would have objected to any plan that did not guarantee they would retain their interests. (**Not Stipulated**).

107. Some buyers pulled out of the bankruptcy sale process due to the existence of the EB-5 Investors. (**Not Stipulated**).

108. On July 9, 2018, the DeBartolo group submitted a Letter of Intent for the purchase of the Lucky Dragon for the purchase price of $53,000,000. (**Not Stipulated**)

109. The DeBartolo group ultimately withdrew from the bankruptcy sale process due, in part, to issues relating to the EB-5 Investors. DeBartolo would later discuss the potential purchase of the Notes with SCC. (**Not Stipulated**).

110. With SCC's full knowledge and consent, CBRE continued to market SCC's Notes

during the Bankruptcy proceeding and at the same time Mr. Sodl was conducting the Bankruptcy proceeding sales process. (**Not Stipulated**).

111.    CBRE communicated with potential buyers, who had received information regarding the Debtor's attempt to sell an interest in the Lucky Dragon during the Bankruptcy, that the amount sought by the Debtor was unreasonable and that those potential buyers could simply buy the Notes from the lender for less than par and control the property. (**Not Stipulated**).

112.    SCC's attempts to sell its Notes hampered the Bankruptcy proceeding sales process. (**Not Stipulated**).

113.    The Bankruptcy auction was held on September 10, 2018.  No successful bid was received at the Bankruptcy auction in excess of SCC's credit bid. (**Stipulated**).

114.    By the nature of bankruptcy and distressed sale situations, the Bankruptcy proceeding sales process did not yield a fair market value offer for the property.    The circumstances of this Bankruptcy, including the EB-5 Investors, the contentiousness of the proceedings and the marketing of SCC's Notes, exacerbated the difficulties of obtaining fair market value for the property. (**Not Stipulated**).

115.    The hotel at the Lucky Dragon was closed on or about October 2, 2018. (**Not Stipulated**).

### *SCC's Appointment of a Receiver and Foreclosure Sale of the Lucky Dragon by CBRE*

116.    On September 25, 2018, SCC filed for relief from the automatic stay in order to sell the Property through a trustee's sale. (**Not Stipulated**).

117.    The SCC stay relief motion was granted on September 25, 2018, and on September 28, 2018, the Substitute Trustee recorded a Notice of Trustee's Sale with the Clark County Recorder's Office as Book/Instrument No. 20180928-0000428. (**Not Stipulated**).

118.    On September 26, 2018, SCC initiated a State Court action to appoint a receiver over the property.  Upon SCC's motion, Larry Bertsch was appointed Receiver.  SCC did not disclose its previous retention of Accountant Bertsch and the advice he previously provided to SCC regarding the Lucky Dragon and the guarantors.  (**Not Stipulated**).

119.    On October 1, 2018, Mr. Bao, an interested buyer from China, submitted a letter of intent to purchase the Lucky Dragon for the sum of $60 million and wired $2.5 million into the Receiver's trust account, but SCC would not consider the proposal and directed the Receiver to return the deposit.  (**Not Stipulated**).

120.    Accountant Bertsch, as Receiver, followed SCC's directions to return Mr. Bao's funds. (**Not Stipulated**).

121.    On October 3, 2018, CBRE was retained by Lucky Dragon to conduct a Trustee Sale of the property. (**Not Stipulated**).

122.    On October 30, 2018, the Lucky Dragon was sold at a Trustee's foreclosure sale. SCC credit bid $35,000,000.00 at the Trustee's sale and acquired the Property.  (**Not Stipulated**).

123.    The Las Vegas Review Journal ran an article on the date of the Trustee's sale in which SCC's representative, Michael Brunet, explained why no one outbid SCC for the Property–"casino owners rarely acquire their properties at repo sales, where a buyer might have to peel off tens of millions of dollars in cashier's checks for a property like the Lucky Dragon." (**Not Stipulated**).

124.    CBRE real estate broker, John Knott, was further quoted to explain that "[p]rospective buyers now have more time to study the property, arrange financing and come up with a business plan . . . ." (**Not Stipulated**).

125.    SCC's credit bid at the foreclosure sale did not reflect the fair market value of the Property. (**Not Stipulated**).

### *The Sale of the Lucky Dragon to Ahern*

126.    CBRE was retained by SCC to sell the Lucky Dragon following the Trustee Sale. There was significant interest in the Property after the foreclosure. (**Not Stipulated**).

127.    This was the first time the Lucky Dragon property was marketed "free and clear." (**Not Stipulated**).

128.    CBRE immediately communicated to potential buyers that obtaining the highest sale price was not the most important factor and that they were most interested in a fast deal. (**Not**

**Stipulated**).

129. For example, CBRE's representatives made the following statements to prospective buyers:

The seller "is ready to transact now and can do a deal with the first party that comes to the table."

"Deal certainty and the amount of time needed to close are going to be the most important factors to Snow Covered at this point."

"Deal certainty and timing to close will likely be more important than pricing to Snow Covered."

"Speed to close is more important than price at this point."

"I would like to give you the full story not simply a price because while price is important it is not the most important element for the seller. Deal certainty and transaction speed will yield the best possible price."

"While we have people saying they will pay us as much as $60 million we do not have any term sheet with financial support. Our client is most interested in a quick certain deal with a reasonable price rather than the maximum price. They will transact in the high $40 millions and be responsible for paying off the two other secured lien holders. We are already engaging with interested parties. We will not be running s [sic] competitive suction [sic] process. The first real group that comes to the table with acceptable price and terms and signs the PSA will be give [sic] the deal."

"Their price flexibility will be maximized if a buyer says they are prepared to put up $5.0 million non-refundable and close within 30 days. A tall order but under that structure I believe Snow Covered will sell for a number that begins with a 4."

The first group depositing $5m into escrow "gets the deal."

"There is going to be a transaction at a valuation lower than our initial pricing guidance if a group can come to the table with a cash offer and close quickly. Not sure if it will get down to the high 30's, but we are going to look at all offers now."

"If any of your investors have an interest in the asset and can close on a deal quickly . . . there is extreme flexibility on pricing."

"Price is going to be dependent on how fast someone can close the transaction . . . ." (**Not Stipulated**).

130.    On December 5, 2018, CBRE sent bid instructions to potential buyers stating the following:

Final bids were due on January 18, 2019 providing for only 44 days (including the traditional 2 week year-end holiday period where little gets accomplished) for potential buyers to conduct their due diligence and make an offer.

Financing contingencies were not acceptable.

"Bids with the soonest closing date will be favored over those that have a future date that is more than a few weeks out."

"Bidders will find the maximum price flexibility if they complete their due diligence prior to the bid date, are prepared to place a $5.0 million non-refundable deposit with Fidelity Title, are prepared to close in less than 10 days and have marked up the PSA in a manner deemed acceptable to the Seller." (**Not Stipulated**).

131.    CBRE sent these bid instructions even though they knew they were unusual, they did not recall ever using language like that before in a sale and did not want to use this language because it could scare away potential buyers. (**Not Stipulated**).

132.    From the inception of this loan, SCC never wanted to own a casino property and thus wanted to dump it quickly after it acquired title at the foreclosure sale. (**Not Stipulated**).

133.    On or about December 24, 2018, CBRE sent a form Purchase and Sale Agreement drafted by SCC (the "*PSA*").  (**Not Stipulated**).

134.    The form PSA provide for a 20-day time period from signing to closing with no due diligence period or conditions. (**Not Stipulated**).

135.    A buyer signing the PSA would have to pay $5 million in cash within one day of acceptance of the PSA and close – including payment of the balance of the purchase price – within

20 days. (**Not Stipulated**).

136.    Although it knew the property needed to be repurposed, CBRE did not perform many critical steps such as preparing financial projections, pro formas or modeling or analyze whether a repositioned casino was viable at the property. (**Not Stipulated**).

137.    SCC ultimately sold the Property to DFA, LLC, an entity controlled by Don Ahern. (**Not Stipulated**).

138.    Mr. Ahern was in a position to make an all-cash offer in the expedited timeframe required by SCC.  Mr. Ahern was an experienced and sophisticated seller/purchaser of commercial real estate.  (**Not Stipulated**).

139.    Based upon the "abnormal" conditions of sale laid out by SCC through CBRE, Mr. Ahern believed this was an opportunity to get an excellent deal if he moved quickly. (**Not Stipulated**).

140.    Mr. Ahern did not perform any due diligence prior to acquiring the Property.  (**Not Stipulated**).

141.    Mr. Ahern never considered including a casino in the Property. (**Not Stipulated**).

142.    Mr. Ahern believes he paid below the actual market value of the property. (**Not Stipulated**).

143.    On January 21, 2019, Mr. Ahern's entity sent a Letter of Intent to purchase the Property for a sale price of $43,000,000 cash at closing.  (**Not Stipulated**).

144.    On February 25, 2019, Mr. Ahern sent a Letter of Intent to Purchase the Property for a sale price of $37,000,000.  (**Not Stipulated**).

145.    On February 25, 2019, Mr. Ahern reduced his offer to purchase the Property to $36,000,000.  (**Not Stipulated**).

146.    SCC and Mr. Ahern's entity entered into a purchase and sale agreement on March 1, 2019 and the sale closed on April 22, 2019 for a purchase price of $36,000,000.  (**Stipulated**).

147.    Mr. Ahern received significant interest in the Property shortly after purchasing it even though he did not solicit any offers and had no interest in selling it.  (**Not Stipulated**).

148.    On March 1, 2019, Griffith Harsh, SCC's owner, sent a text stating he would "sign the Ahern doc [and] take the loss out [W]eidner [sic] and Fonfa's ass."  (**Not Stipulated**).

149.    Despite being the owner and ultimate decision-making authority of SCC, Mr. Harsh was not directed to preserve his text messages and did not take steps to preserve them. (**Not Stipulated**).

150.    Mr. Harsh's anger included lashing out at his own broker. CBRE, as being "(expletive) incompetent." (**Not Stipulated**).

151.    SCC ultimately prevented buyers from having sufficient time "to study the property, arrange financing, or come up with a business plan." (**Not Stipulated**).

152.    Instead, SCC chose to quickly dump the Property and pursue the Guarantor Defendants for any deficiency. (**Not Stipulated**).

153.    The process to sell the Property during this time frame was necessarily tainted by the statements and actions by SCC and its agent CBRE.  These actions had a significant impact on the ability for the Property to be effectively sold and the ultimate sale price that was achieved for the Property. (**Not Stipulated**).

154.    The sale price to Mr. Ahern's entity did not reflect the fair market value of the Property. (**Not Stipulated**).

155.    SCC elected to have Accountant Bertsch continue to maintain and manage the property for SCC post-foreclosure through and including SCC's sale to Mr. Ahern's entity. (**Stipulated**).

### *The Claimed Indebtedness*

156.    SCC's damages claim in this matter has never been clear.  It appears that SCC claims it was owed approximately $57,000,000 on October 30, 2018, the date of the Trustee's sale. Defendants contest the accuracy of this amount, which includes, among other things, excessive interest calculations based upon an improper compounding and calculation of interest, as discussed in the expert report of Scott Leslie, CPA/ABV, CVA, CFF.  Defendants further contest the reasonableness and entitlement to SCC's claimed statutory Indebtedness and damages.  Among

other things, aspects of SCC's claimed pre-foreclosure attorneys' fees and costs (as discussed in the expert report of Elise Frejka), certain items claimed by SCC under the guise of "Receivership" expenses and SCC's claimed post-foreclosure damages are not recoverable and unreasonable in any event. (**Not Stipulated**).

157.    Among other things, SCC is seeking to include as part of its claimed Indebtedness the amounts it had to pay as damages to Century Link (and related costs including attorney's fees) resulting from SCC being found in contempt of court by the Bankruptcy Court.  (**Not Stipulated**).

158.    SCC understood and acknowledged that the Recourse Guaranty limited the guarantors' liability to obligations that arose prior to the foreclosure.  (**Not Stipulated**).

159.    Yet SCC has taken the position that it can back-charge the guarantors for its cost to maintain the property after it obtained title and ownership at the foreclosure sale on October 30, 2018 until such time as it chose to terminate the Receivership, which SCC elected not to do until after it had sold the property and for nearly one year after the foreclosure sale.  (**Not Stipulated**).

160.    SCC manipulated the Receivership to purport to continue to require a "Receiver" long after the Lucky Dragon had been foreclosed and was no longer its "collateral," in a transparent and wrongful attempt to seek recovery of its post-foreclosure ownership expenses from the guarantors in this deficiency action. (**Not Stipulated**).

### *The Fair Market Value of the Property*

161.    Both sides have engaged experts to offer opinions regarding the Property and the fair market value of the Property. (**Stipulated**).

162.    A repositioned casino at the Property would clearly have been financially feasible as of the Valuation Date. (**Not Stipulated**).

163.    There were critical differences between a typical sale process and those actually used to sell the various interests in the Lucky Dragon.  These differences had a significant impact on the ability for the Property to be effectively sold and the ultimate sale price that was achieved for the Property. (**Not Stipulated**).

164.    The market value of the Property as of October 30, 2018 was $63,770,000. (**Not

**Stipulated**).

## IV. FACTS, THOUGH NOT ADMITTED, THAT WILL NOT BE CONTESTED AT TRIAL BY EVIDENCE TO THE CONTRARY.

The parties include no facts meeting this description at this time. Once the motions in limine and the disputes over the parties' competing lists of facts are resolved, it may be possible to add to this category.

## V. ISSUES OF FACT TO BE TRIED AND DETERMINED AT TRIAL.

Facts from Section III that have not been stipulated by the parties are incorporated into this Section V by reference. Additionally, the parties provide their respective general views of the facts to be determined at trial.

**A. PLAINTIFF'S VIEW.**

The following are the issues of fact to be tried and determined at trial.[4]

1. What was the amount of the secured debt as of the date of the foreclosure sale?

2. What amount was actually paid for the Property at the foreclosure sale? What was the fair market value of the Property sold on the date of the foreclosure sale?

3. What amounts do the Guarantors owe SCC under the terms of the Guaranty, the related loan documents, and the applicable law?

4. Plaintiff further states that the resolution of the forthcoming SCC motions in limine could reduce the contested issues of law and fact in this case, which could also reduce the length of trial substantially.

**B. DEFENDANTS' VIEW.**

1. What was the indebtedness on the date of foreclosure?

2. What was the fair market value of the Property on the date of foreclosure?

3. Is any deficiency owed by the Guarantors?

---

[4] Should the attorneys or parties be unable to agree on the statement of issues of fact, the joint pretrial order should include separate statements of issues of fact to be tried and determined upon trial.

44

To the extent that the Defendants' Statements of Issues of Fact contain issues of law, those issues are incorporated herein by reference. Should the Court determine that any issue identified in this list as an issue of law is more properly considered an issue of fact, the parties incorporate such issues by reference into their respective Statement of Issues of Fact.

## VI.    ISSUES OF LAW TO BE TRIED AND DETERMINED AT TRIAL.

The following issues of law are to be tried and determined at trial.[5]

**A.    PLAINTIFF'S VIEW.**

1.    What damages, interest, attorneys' fees, and costs may SCC recover from the Guarantors under the Guaranty, the related loan documents, and the applicable law.

2.    Plaintiff SCC objects to Defendants' characterizations of the Issues of Law. Defendants' section on those issues (below) is just an effort to pre-argue positions they know to be in dispute, and not an effort to identify for the Court those specific issues of law to be tried.

3.    Plaintiff further states that the resolution of the forthcoming SCC motions in limine could reduce the contested issues of law and fact in this case, which could also reduce the length of trial substantially.

**B.    DEFENDANTS' VIEW.**

1.    The Court previously found that SCC cannot include post-foreclosure expenses as part of the Indebtedness when calculating a deficiency judgment under NRS 40.459. (ECF Nos. 243 and 264). The Court did not address whether SCC has other means to collect its post-foreclosure expenses to the extent that it is entitled to recover them under the Loan Documents. (ECF No. 264).

2.    SCC contends it has a contractual right to recover post-foreclosure expenses as a measure of damages under the Loan Documents. Defendants contend that SCC is limited under NRS 40.459 to the difference between any indebtedness and the fair market value of the Property

---

[5] Should the attorneys or parties be unable to agree on the statement of issues of law, the joint pretrial order should include separate statements of issues of law to be tried and determined upon trial.

on the date of foreclosure.  The Court will need to determine if SCC can circumvent Nevada's anti-deficiency protections by claiming damages under contract.

3. Defendants contend that the Loan Documents should be interpreted in a manner that is consistent with the anti-deficiency protections provided under Nevada law.  The Recourse Guaranty expressly limits any liability to any amounts owed as of the date of any foreclosure. SCC has argued that when the Property became an asset of the estate in the bankruptcy proceedings, it triggered liability for all of the Secured Obligations, which include essentially every obligation contained in the Loan Documents.  The term "Secured Obligations" is not defined in the Recourse Guaranty.  Rather, it is defined in the Deed of Trust and broadly includes the following: (1) Payment of all principal, interest, fees and other charges under the two Notes; (2) Payment of all sums advanced by the Lender to protect the trust estate, with interest; (3) Payment of any subsequent loans to borrower; (4) Performance of every obligation contained in the Loan Documents; (5) Performance of every obligation of Borrower secured by the Deed of Trust; and (6) Compliance with every CC&R pertaining to the Trust Estate.  The term "Loan Documents" is then defined in the Construction Loan Agreement to include, among other things, the Recourse Guaranty.  Thus, all of the damages SCC seeks in this matter fall under the definition of Secured Obligations under the Deed of Trust.  The Secured Obligations only include pre-foreclosure damages and terminated on the date of the trustee's sale.  The Court will need to determine whether the Loan Documents permit SCC to recover damages that exceed the Secured Obligations (as defined in the Loan Documents).

4. Defendants contend that SCC's calculation of Indebtedness is not supported by the terms of the Loan Documents or the evidence.  The Court will need to determine the proper calculation of Indebtedness under the Loan Documents.

5. Defendants anticipate that there may also be legal issues pertaining to the proper methodology to determine the fair market value of the Property.

6. The Court previously determined that SCC is not precluded from seeking any post-foreclosure attorneys' fees (as distinguished from any other claimed post-foreclosure damages) to

which they are contractually entitled through a post-judgment motion under Federal Rule of Civil Procedure 54. (ECF No. 243). Defendants fully reserve the right to contest any such motion, including challenges to the reasonableness of the fees and costs sought.

## VII.    EXHIBITS AND DEPOSITIONS.[6]

1.    Plaintiff's list of stipulations to Defendants' exhibits are attached hereto as Exhibit "A".

2.    Defendants' list of stipulations to Plaintiff's exhibits are attached hereto as Exhibit "B".

3.    As to the following exhibits, the party against whom the same will be offered objects as follows:

  a.  The Plaintiff's exhibits and Defendants' objections to them are set forth in Exhibit "C" hereto.

  b.  The Defendants' exhibits and Plaintiffs' objections to them are set forth in Exhibit "D" hereto.

  c.  Joint Reservations. In addition to the party-specific reservations described above, the parties jointly agree to the following reservations of rights: First, each party reserves the right to use an exhibit from another party's exhibit list. Second, the parties agree that the inclusion of an exhibit on one party's list does not waive that party's right to object to the other party's use of the same document. For example, Defendants might introduce a document that is a party admission by Plaintiff, but may object to Plaintiff's use of the same document. Third, in addition to the exhibits identified on their respective exhibits lists, the parties reserve their respective rights to use demonstrative exhibits, aids, charts, graphs, and other presentations at trial. The parties shall exchange demonstrative exhibits on or before 30 days before trial.

---

[6] The deposition designations and exhibits included in this Section VII are subject to change by reason of motions in limine or the parties' election to withdraw them at a future date.

      d.  Objections.  The parties are continuing to meet and confer in good faith regarding their objections and stipulations to exhibits.  The parties will also meet and confer to remove duplicate exhibits prior to trial.  The parties' objections and stipulations are subject to the reservations below:  First, the parties reserve their respective rights to object to all exhibits that have not been produced.  Second, the parties reserve their respective rights to object at trial to all photographic, demonstrative, and/or physical exhibits.  Third, by objecting to certain exhibits, the parties do not waive their respective rights to introduce the same exhibits at trial.  For example, certain exhibits on one party's list might be inadmissible hearsay if introduced by that party, but may be admissible as party admissions if offered against the other party.  Fourth, the parties reserve their respective rights to object to exhibits, including stipulated exhibits that are not facially objectionable but are introduced in an objectionable manner at trial.

4.  Electronic evidence: This will be a bench trial and the parties do not intend to present electronic evidence for purposes of jury deliberations.

5.  Depositions:

      a.  Plaintiff SCC will offer the depositions identified in Exhibit "E" hereto.

      b.  Defendants will offer the depositions identified in Exhibit "F" hereto.

6.  Objections to depositions:

      a.  Defendants' objections to Plaintiff's deposition designations are set forth in Exhibit "G" hereto.

      b.  Plaintiff's objections to Defendants' deposition designations are set forth in Exhibit "H" hereto.

### VIII.   WITNESSES.

The witnesses identified in Exhibits "I" and "J" may be called by the parties at trial.  Those

listed are in addition to the witnesses who will appear by deposition.[7]  All parties reserve the right to object to any witnesses who were not sufficiently identified in their respective Initial Disclosures or supplements thereto.

**A.     PLAINTIFF'S WITNESSES.**

Plaintiff's witnesses are listed in Exhibit "I" hereto.  That list is divided into those that SCC expects to call and those that it may call.

**B.     DEFENDANTS' WITNESSES.**

Defendants' witnesses are listed in Exhibit "J" hereto.  That list is divided into those that Defendants expect to call and those that they may call.

**IX.     PENDING MOTIONS.**

The following motions, including motions in limine, have been filed and are now pending before this Court.

1.  Snow Covered Capital's Motion in Limine to Exclude the Testimony of Expert Witness Scott Leslie (ECF No. 271) was denied on November 22, 2022 (ECF No. 280).  However, SCC reserves all its rights to challenge Mr. Leslie's opinions at trial.

2.  Both sides intend to file additional motions in limine if they cannot resolve the objections and disputes relating to those motions.

**X.     PROPOSED TRIAL DATES.**

The only trial stack on which both sides could agree was the November 13th trial stack, which encompasses three weeks and includes the Thanksgiving holiday.  When the Court opens again on Monday, the parties will inquire into availability during the January and February 2024 trial stacks.  Earlier dates would be preferable, but the parties' known schedules precludes their selection.

---

[7]  The depositions designated to be offered in this section do not include witnesses who are believed to still reside within the jurisdiction and will be subpoenaed for trial (included in Section VIII herein).  The parties reserve the right to use the depositions to impeach these witnesses at trial, if necessary.  Further, the parties reserve the right to supplement Section VII with deposition designations for any witnesses within the jurisdiction who becomes unavailable at the time of trial.

It is expressly understood by the undersigned that the court will set the trial of this matter on an agreed-upon dates if possible; if not, the trial will be set at the convenience of the court's calendar.

### XI.    ESTIMATED LENGTH OF TRIAL.

It is estimated that the trial before this Court will take a total of 15–20 trial days.

APPROVED AS TO FORM AND CONTENT:

By: */s/ Oliver J. Pancheri*
Nicholas Santoro (NV Bar No. 532)
Oliver J. Pancheri (NV Bar No. 7476)
SANTORO WHITMIRE, LTD.
10100 W. Charleston Boulevard, Suite 250
Las Vegas, Nevada 89135
Tel.: (702) 948-8771
Email:  nsantoro@santoronevada.com
          opancheri@santoronevada.com

**and**

David B. Snyder *(admitted Pro Hac Vice)*
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103
Tel.: (215) 299-2000
Email:  dsnyder@foxrothschild.com

*Attorneys for Defendants William Weidner and David Jacoby*

By: */s/ Robert Hernquist*
Robert Hernquist (NV Bar No. 10616)
Mark Gardberg (NV Bar No. 10879)
HOWARD & HOWARD ATTORNEYS PLLC
Wells Fargo Tower, Suite 1000
3800 Howard Hughes Parkway
Las Vegas, Nevada 89169-5980
Tel.: (702) 257-1483
Email: rwh@h2law.com
          mjg@h2law.com

*Attorneys for the Probate Estate of Defendant Andrew S. Fonfa*

By: */s/ James D. McCarthy*
James D. McCarthy (*pro hac vice*)
Mary Ann Joerres (*pro hac vice*)
David Reynolds (*pro hac vice*)
DIAMOND MCCARTHY, LLP
2711 N. Haskell Ave., Suite 3100
Dallas, TX 75204
Tel: (214) 389-5300
Email: jmccarthy@diamondmccarthy.com
Mjoerres@diamondmccarthy.com
Dreynolds@diamondmccarthy.com

**and**

Bob L. Olson (NV Bar No. 3783)
SNELL & WILMER, L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
bolson@swlaw.com

*Attorneys for Plaintiff Snow Covered Capital, LLC*

## XII.    ACTION BY THE COURT.

This case is set for court/jury trial on the fixed/stacked calendar on _____.

Calendar call will be held on _____.

DATED: _____

_____
UNITED STATES DISTRICT JUDGE OR
UNITED STATES MAGISTRATE JUDGE

51