UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| SNOW COVERED CAPITAL, LLC,<br><br>　　　　Plaintiff<br><br>v.<br><br>WILLIAM WEIDNER, et al.,<br><br>　　　　Defendants | Case No.: 2:19-cv-00595-APG-NJK<br><br>**Findings of Fact and Conclusions of Law** |

　　　　As required by Federal Rule of Civil Procedure 52(a), I enter my findings of fact and conclusions of law following the bench trial in this case.

**I.　　FINDINGS OF FACT**

　　　　1.　　Defendant Lucky Dragon, LP (LD LP) is a Nevada limited partnership.

　　　　2.　　Snow Covered Capital, LLC (SCC) is a single purpose California limited liability company which was formed to fund a loan to LD LP.

　　　　3.　　On May 3, 2016, SCC entered into written contracts to provide loans to LD LP to complete the construction of a new hotel and casino in Las Vegas, Nevada to be called the Lucky Dragon.  These contracts included:

- A Construction Loan between SCC and LD LP. Exh. 16.
- A Secured Promissory Note (Construction Loan) given by LD LP and payable to SCC in the amount of $30,000,000 and a Secured Promissory Note (Line of Credit) given by LD LP and payable to SCC in the amount of $15,000,000 (collectively the Notes). Exhs. 12, 13.

/ / / /

- A Construction Deed of Trust executed by LD LP for the benefit of SCC that was recorded against the Lucky Dragon property. Exh. 29.
- A Completion Guaranty Agreement signed by William Weidner, Andrew Fonfa, and David Jacoby (the Guarantors). Exh. 21.
- A Recourse Obligations Guaranty signed by Weidner, Fonfa, and Jacoby. Exh. 15.
- A First Amendment to Construction Loan Agreement and Extension Agreement, which extended the maturity date for the repayment of the amounts borrowed. Exh. 43.

4. In addition to the loans from SCC, LD LP obtained approximately $90,000,000 from foreign nationals who invested under the then-effective EB-5 program, 8 U.S.C. § 203(b)(5). *See* 8 C.F.R. § 204.6; USCIS Policy Manual, Vol. 6, Part G, Ch. 4; Final Rule, 84 Fed. Reg. 35750, 35752 (July 24, 2019). These EB-5 investors became limited partners in LD LP.

5. The Lucky Dragon real estate and improvements (the Property) were owned by LD LP. Lucky Dragon, LLC (LD LLC) operated the hotel and casino.

6. The Lucky Dragon was built in 2016 at a cost of more than $160,000,000. It was located along the north side of Sahara Avenue, between Fairfield Avenue and Tam Drive, one-quarter mile west of the Las Vegas Strip. It included a 203-room hotel, 27,500-square-foot casino, and 408 parking spaces on 2.51 acres of land.

7. The Lucky Dragon amenities included a lobby with a front desk and reception area, multiple food and beverage outlets, casino space, retail areas, a business center, spa,

/ / / /

outdoor swimming pool, guest pantry/gift shop, guest laundry, attached parking garage, and wireless high-speed internet.

8. The Lucky Dragon's business plan was to cater to high-end Asian gamblers.

9. The Lucky Dragon opened on November 19, 2016. Its profitability struggled from the outset, primarily due to a poor "hold" percentage in the casino, particularly in baccarat. In the spring of 2017, LD LP began efforts to find funds to pay off the SCC loans. Those efforts later expanded to also attempt to sell the Property and the general partner interests in LD LP and LD LLC.

10. While the Lucky Dragon struggled financially, Weidner and Fonfa, through their affiliated entities, infused additional funds to keep the Property operating throughout 2017, with the majority of those funds (over $18 million) provided by entities affiliated with Weidner.

11. The existence of EB-5 investors made it difficult to sell the Property or interests in the businesses.

12. On August 8, 2017, SCC issued a formal notice of default. Exh. 55.

13. On August 18, 2017, SCC sent a notice of default and demand letter. Exh. 67.

14. After the default, SCC entertained offers for the purchase of its Notes.

15. On September 1, 2017, SCC recorded a Notice of Default and Election to Sell under Deed of Trust, which was recorded in the Clark County Recorder's Office as Book/Instrument No. 20170901-0000515. Exh. 72.

16. On January 4, 2018, the Lucky Dragon casino, bars, and three of the four restaurants were closed. ECF No. 288 at 33 ¶ 76.

17. On January 9, 2018, SCC recorded a Notice of Trustee's Sale with the Clark County Recorder's Office as Book/Instrument No. 20180109-0001520. Exh. 120.

18. The SCC Trustee's sale was scheduled to take place on February 6, 2018.

19. LD LP and LD LLC filed for Chapter 11 bankruptcy protection in February 2018, which stalled the Trustee's sale.

20. SCC filed in the bankruptcy case two appraisals (the Harper appraisals) that valued the property at $60,000,000 as of January 31, 2018 and $55,500,000 as of May 4, 2018. I do not rely on those appraisals as indicative of the Property's fair market value as of the foreclosure date. Nevertheless, SCC represented to the bankruptcy court that the Property was worth between $55,500,000 and $60,000,000 in the first half of 2018, and the bankruptcy court agreed. Exh. 594 at 8.

21. On September 10, 2018, a bankruptcy auction was conducted at which SCC credit bid $35,000,000 for the Lucky Dragon assets. Exh. 200. That purchase was never completed.

22. The hotel at the Lucky Dragon closed on October 2, 2018.

23. On September 25, 2018, the bankruptcy court granted SCC's motion for relief from the automatic stay in order to sell the Property through a Trustee's sale.

24. On October 30, 2018, the Lucky Dragon was sold at a Trustee's foreclosure sale to SCC for a credit bid of $35,000,000.00.

25. SCC then retained CBRE to sell the Property.

26. CBRE immediately began communicating to potential buyers that obtaining the highest sale price was not the most important factor to SCC, and that SCC was most interested in a quick transaction. For example, CBRE made the following statements to prospective buyers:

- "Deal certainty and the amount of time needed to close are going to be the most important factors to Snow Covered at this point." Exh. 673.

/ / / /

- "Deal certainty and timing to close will likely be more important than pricing to Snow Covered at this point." Exh. 702. *See also* Exh. 704 (similar).
- "Speed to close is more important than price at this point." Exh. 703.
- "I would like to give you the full story not simply a price because while price is important it is not the most important element for the seller.  Deal certainty and transaction speed will yield the best possible price." Exh. 675.
- "While we have people saying they will pay us as much as $60 million we do not have any term sheet with financial support.  Our client is most interested in a quick certain deal with a reasonable price rather than the maximum price.  They will transact in the high $40 millions and be responsible for paying off the two other secured lien holders.  We are already engaging with interested parties.  We will not be running s [sic] competitive suction [sic] process.  The first real group that comes to the table with acceptable price and terms and signs the PSA will be give [sic] the deal." Exh. 713.
- "Their price flexibility will be maximized if a buyer says they are prepared to put up $5.0 million non-refundable and close within 30 days.  A tall order but under that structure I believe Snow Covered will sell for a number that begins with a 4." Exh. 696 at 2.
- "If any of your investors have an interest in the asset and can close on a deal quickly . . . there is extreme flexibility on pricing." Exh. 713.

27. On December 5, 2018, CBRE sent bid instructions (Exh. 241) to potential buyers stating the following:

- Final bids were due on January 18, 2019.

5

- Financing contingencies were not acceptable.
- "Bids with the soonest closing date will be favored over those that have a future date that is more than a few weeks out."
- "Bidders will find the maximum price flexibility if they complete their due diligence prior to the bid date, are prepared to place a $5.0 million non-refundable deposit with Fidelity Title, are prepared to close in less than 10 days and have marked up the PSA in a manner deemed acceptable to the Seller."

28. SCC's proposed Purchase and Sale Agreement called for a $5,000,000 deposit, a 20-day period from signing to closing, no due diligence period, and no conditions. ECF No. 700.

29. SCC ultimately sold the Property to DFA, LLC, an entity controlled by Don Ahern, for $36,000,000. The parties signed a letter of intent to purchase the Property on February 25, 2019 and entered into a purchase agreement on March 1, 2019. Exhs. 259, 260. The sale closed on April 22, 2019 for a price of $36,000,000.

30. The sale to Ahern was not indicative of the fair market value of the Property because of several significant differences between a typical sale process and the events that led up to the Ahern purchase. For instance, SCC was very interested in selling quickly and not commanding the highest purchase price. It clearly conveyed that message to potential buyers through CBRE's messaging.

31. Ahern was in a position to make an all-cash offer in the expedited timeframe required by SCC. He was an experienced and sophisticated seller and buyer of commercial real estate. He was familiar with the location and the builder, and his son-in-law was in management of the Lucky Dragon when it was operational.

/ / / /

32. Ahern believed the conditions of sale laid out by SCC through CBRE were "abnormal," which presented him an opportunity to get an excellent deal if he moved quickly.

33. Ahern never considered including a casino in the Property. The appraisers that testified at trial all agreed that the highest and best use of the Property—and therefore the highest value—would come from including a casino in the Property's operation.

34. Ahern believed he paid below the actual market value of the Property, and felt he could double his purchase price in two years. Ahern Trans. at 55:15-56:16.

35. Shortly after purchasing the Property, Ahern received several inquiries from people interested in buying it from him even though he did not solicit any offers and had no interest in selling it. *See* Ahern Trans. at 43:6-46:9; Exhs. 757, 759, 760, 762; Ahern Trans. at 62:18-63:122 (Ahern would not have re-sold the Property for $50,000,000).

36. SCC filed this lawsuit on April 8, 2019 as an "Application for Deficiency Judgment." ECF No. 1 at 1.

37. To determine the existence and amount of a deficiency, if any, I must determine both the amount of the indebtedness on the date of the Trustee's sale and the Property's fair market value on that date. The difference between those numbers determines the amount of any deficiency.

38. The parties stipulate that the total indebtedness owed by the Guarantors on October 30, 2018 (the date of the Trustee's sale) was $59,200,705.33. ECF No. 451.

39. Accordingly, the primary question to be determined at the bench trial is the fair market value of the Property on October 30, 2018.

40. Three appraisers testified at trial regarding the fair market value (FMV) of the Property as of October 30, 2018. SCC presented Scott Krueger and William Kimmel, and the

defendants presented Tio DiFederico (collectively, the Appraisers). I found all three Appraisers to be credible and professional, so I disregard none of their testimony or opinions. However, I disagree with some of the factors each of them considered in reaching their conclusions.

41. The Appraisers agree on the following FMV definition: "Fair market value is generally defined as the price which a purchaser, willing but not obliged to buy, would pay an owner[,] willing but not obliged to sell, taking into consideration all the uses to which the property is adapted and might in reason be applied." *Unruh v. Streight*, 615 P.2d 247, 249 (Nev. 1980).

42. The Appraisers agree that the highest and best use of the Property was as a casino-hotel. Thus, they agree that a casino-hotel—as opposed to a hotel without a casino—was feasible and the most valuable use of the Property.

43. All three Appraisers used the Income Approach to value the Property. In doing so, each first estimated the stabilized value of the Property. Stabilization occurs when a property is operating at its optimum potential. All three Appraisers projected a stabilized EBITDA[1] and multiplied that by a multiplier they determined to be appropriate, which produced a stabilized value. All three Appraisers then deducted an amount for the costs they believed would be necessary to achieve stabilization, which produced their ultimate FMV opinions.

44. The Appraisers estimated the following stabilized EBITDA for the Property:

    DiFederico:   $12,966,403

    Krueger:   $8,560,514

    Kimmel:   $10,000,000

////

---

[1] Earnings Before Interest, Taxes, Depreciation, and Amortization.

45.   DiFederico and Krueger based their EBITDA opinions on revenue and expense projections for different components of a casino-hotel – e.g., casino, hotel, food and beverage, etc. Kimmel did not do that analysis.

46.   The biggest differences between DiFederico's and Krueger's EBITDA estimates are their casino revenue and expense projections.

47.   After projecting the stabilized EBITDA, the Appraisers determined the appropriate multiplier. A multiplier, like a capitalization rate, is an appraisal tool to convert a property's EBITDA to FMV. The Appraisers each selected what they believed was the appropriate multiplier and then multiplied their stabilized EBITDA by that number to get a stabilized value.

48.   The Appraisers used the following multipliers:

    DiFederico:   9.5

    Krueger:   7.75

    Kimmel:   7

49.   To determine the appropriate multipliers, each of the Appraisers considered sales of casino properties. Thus, a critical component of their analyses was selecting the sales most comparable to the Property. It is preferable to use sales as close in time and location as possible.

50.   Multiplying their EBITDA projections by their multipliers produced the following estimated stabilized values:

    DiFederico:   $123,000,000

    Krueger:   $66,300,000

    Kimmel:   $70,000,000

/ / / /

51. The Appraisers' last step was to deduct the costs they believed necessary to reach stabilization. The deductions included costs to reposition the property, lost revenue while the Property is closed for repositioning, entrepreneurial profit, etc. The Appraisers made the following deductions:

|  | **Deduction** | **% of Stabilized Value** |
|---|---|---|
| DiFederico | $59,226,300 | 48% |
| Krueger | $27,800,000 | 42% |
| Kimmel | $33,400,000 | 48% |

52. The Appraisers' opinions of the Property's FMV are as follows:

| DiFederico: | $63,770,000 |
|---|---|
| Krueger: | $38,500,000 |
| Kimmel: | $36,500,000 |

53. I agree with Kimmel that this Property is very difficult to appraise because it is "betwixt and between." The Property is approximately 2.5 miles from downtown Las Vegas and thus not connected to the synergy that seems to exist among the hotels and casinos on or near Fremont Street. It is one-quarter mile west of the Las Vegas Strip, so it is within a short walking distance to the then-developing north end of the Strip (*e.g.*, Resorts World, Convention Center expansion, Fontainebleau). But it does not have the pedestrian traffic that benefits Strip-front properties. It is much closer to the Strip than the Tuscany Suites & Casino, Silver Sevens Hotel & Casino, and Palms Casino Resort. Thus, comparisons to downtown properties and Strip properties are difficult to gauge.

54. The Appraisers used data reported by the Nevada Gaming Control Board. *See, e.g.*, Exhs. 708, 780. The data is grouped into "bands" of revenue combining several properties

in each band. It becomes difficult to precisely compare that data to the Property. DiFederico's comparable properties were skewed somewhat higher because he included in his database Strip megaresorts, whose revenue would be expected to be higher than the Property's. On the other hand, Krueger and Kimmel included properties that are less comparable but on the lower end (e.g., Club Fortune and smaller downtown casinos). Kimmel acknowledged that if you exclude some of the downtown properties in these revenue bands that are not truly comparable to this Property, his EBITDA estimate would be closer to $20,000,000.

55. Kimmel and DiFederico both assumed the Property would have 37 table games. Krueger's analysis, using fewer table games based on casino square footage, seemed a bit contorted and less anchored to customer demand.

56. DiFederico's estimate of table game revenue was confirmed by long-time, respected market participants. ECF No. 466 at 13-14.

57. DiFederico's multiple of 9.5 was properly based on sales of comparable properties reasonably close in time and location to the Property. Kimmel used sales that were more remote in time, and the only Las Vegas property he used was Club Fortune, which has no hotel and is not comparable. Krueger relied on sales from Pennsylvania and Missouri and the local Club Fortune, and included "proforma" EBITDA instead of "trailing" EBITDA. Kimmel and DiFederico used trailing EBITDA. Trailing EBITDA are based on actual numbers, while proformas are estimates and thus are more risky and less accurate. Krueger testified that using trailing EBITDA usually results in using higher multipliers as well.

58. Overall, DiFederico's estimate of FMV was more accurate than Krueger's and Kimmel's, although I do not agree with it in total. A reduction is necessary to account for the somewhat higher values that result from including the Strip megaresorts in the database.

11

59. Based on all the evidence, I find that the fair market value of the Property as of October 30, 2018 was $60,000,000.

60. Contrary to SCC's argument, the price Ahern paid for the Property is not indicative of its FMV. SCC wanted to sell quickly and conveyed that message to potential buyers. The conditions of sale laid out by SCC through CBRE (including very limited, if any, due diligence) were abnormal and narrowed the pool of potential purchasers. Ahern knew he could get an excellent deal by moving quickly because he was one of the few who could make an all-cash offer in the expedited timeframe required by SCC. SCC's expert appraiser Krueger agreed that aspects of the sale to Ahern were "atypical." Further, Ahern did not include the value of a casino in the purchase price, but all of the Appraisers agreed that including a casino would increase the Property's value.

61. Similarly, most of the "data points" SCC relies upon are not indicative of the FMV. Bankruptcy auctions and foreclosure sales are not reliable indicators of FMV. During the bankruptcy, SCC and its agents were marketing a variety of purchase options, including equity in the entities and purchasing the Property. The mixed signals and the looming bankruptcy auction and foreclosure sale also depressed interest in paying a high price for the Property. The existence of the EB-5 investors further complicated sale efforts and reduced interest, and would result in a lower sale price. SCC's agent John Knott confirmed these complications and their impact on price. *See* Exh. 696 at 1 ("The challenge with the [bankruptcy] sale was [that] not all property issues, including EB-5, would be resolved via a sale through bankruptcy. . . . We explained to Snow Covered that until they own the property and we can communicate what they are selling the value will be lower.").

/ / / /

62. In addition, SCC represented to the bankruptcy court that the Property was worth between $55,500,000 and $60,000,000 in the first half of 2018, and the bankruptcy court agreed. Exh. 594 at 8. SCC argues that I cannot rely on the "Harper appraisals" that formed the bases for SCC's court representations. I give no weight to the Harper appraisals. However, SCC contends I should rely on "data points" from the bankruptcy period (e.g., the bankruptcy auction). If so, then it is fair to include as data points SCC's representations to the bankruptcy court about the Property's value in the first half of 2018, and the bankruptcy court's agreement.

63. I put no credence in the bankruptcy auction, foreclosure sale, or sale to Ahern as indicators of the Property's FMV. Rather, I place more emphasis on Ahern's testimony that he purchased the Property well below market value. The fact that he received several inquiries about flipping the Property shortly after he purchased it reflects that his purchase price was well below FMV. His belief that he could double his investment (i.e., to $72,000,000) in two years, while not definitive or based on appraisal expertise, is more reliable than SCC's "data points." It also confirms DiFederico's FMV opinion as the most accurate, and supports my conclusion on the Property's FMV.

## II.   CONCLUSIONS OF LAW

Nevada Revised Statutes (NRS) § 40.459(2) limits the amount of a deficiency judgment to the lesser of:

(a) The amount by which the amount of the indebtedness which was secured exceeds the fair market value of the property sold at the time of the sale, with interest from the date of the sale; or
(b) The amount which is the difference between the amount for which the property was actually sold and the amount of the indebtedness which was secured, with interest from the date of sale . . . .

/ / / /

"Nevada's deficiency legislation is designed to achieve fairness to all parties to a transaction secured in whole or in part by realty." *First Interstate Bank of Nevada v. Shields*, 730 P.2d 429, 431 (Nev. 1986).  *Shields* expressly applied the protections of Nevada's deficiency judgment statutes to guarantors. *Id*. at 430-31.

"Fair market value is generally defined as the price which a purchaser, willing but not obliged to buy, would pay an owner[,] willing but not obliged to sell, taking into consideration all the uses to which the property is adapted and might in reason be applied." *Unruh v. Streight*, 615 P.2d 247, 249 (Nev. 1980).  The fair market value of property in a deficiency judgment action is determined as of the date of the foreclosure sale. *Id*. at 248.

The party seeking a deficiency judgment has the burden of proof for every element of a deficiency judgment, including the fair market value of the property. *Branch Banking & Tr. Co. v. Desert Canyon Phase II, LLC*, No. 2:12cv-1463-JCM-PAL, 2016 WL 9108912, at *2 (D. Nev. Mar. 14, 2016); *Miller v. Assurity Life Ins. Co.*, 2014 WL 859230 at *2–3 (Nev. Feb. 28, 2014).

## III.   CONCLUSION

The fair market value of the Property on October 30, 2018 was $60,000,000 and the indebtedness was $59,200,705.33, leaving no deficiency as of October 30, 2018.

DATED this 2nd day of July, 2024.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE